STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, v. LESTER M. PALMER, RESPONDENT.

71 N. W. 2d 491

Filed July 8, 1955. No. 33822.

*Clarence S. Beck,* Attorney General, and *Robert A. Nelson,* for relator.

*Lester M. Palmer* and *Herbert T. White,* for respondent.

Heard before SIMMONS, C. J., CARTER, CHAPPELL, WENKE, and BOSLAUGH, JJ., and FLORY, District Judge.

SIMMONS, C. J.

This is a proceeding brought by the State on the relation of the Nebraska State Bar Association praying for disciplinary action against the respondent, Lester M. Palmer.

We render judgment of disbarment.

The respondent has been for many years a member in good standing of the bar of this state, and likewise for many years an elected judge of the municipal court of the city of Omaha. At the time of the principal events mentioned herein, he was presiding over the traffic court of that city.

The Committee on Inquiry of the Fourth Judicial District conducted an inquiry regarding a "hit-and-run" accident involving property damage only, in which re-

spondent was involved in Douglas County in December 1953, and misdemeanor charges arising as a result of events that occurred in Council Bluffs, Iowa, in which respondent was involved in June 1954.

The Advisory Committee considered the charges. It did not investigate the Council Bluffs incident. It did investigate the matter of conduct and statements and representations made by respondent to the deputy county attorney of Douglas County between the time of the December 1953 accident and respondent being found guilty of a misdemeanor charge arising therefrom. It recommended that this court administer appropriate discipline.

See Rules of the Supreme Court, Integration of the Bar, Article XI, for the procedures here followed.

A transcript of the proceedings before the Advisory Committee and of its hearings was filed with this court.

The fact recital herein is taken from the proceedings before the Advisory Committee.

It appears that in the late afternoon of December 7, 1953, a car driven by respondent collided with a car owned by a man named Pilant, causing property damage. Respondent did not stop, but left the scene of the accident. A motorist following respondent reported the license number of respondent's car. Shortly after the accident respondent had a conversation with a Safety Patrol officer. Respondent testified that he told the officer "I was driving." The evidence is not disputed.

The county attorney's office was notified of the accident. Apparently this notice came from the Safety Patrol officer. A deputy county attorney was assigned to investigate. We will refer to him hereinafter as the county attorney.

During the evening the county attorney had found two witnesses who related that they saw the accident, and that there were two persons in respondent's car whom they did not then identify, although later one of the witnesses advised the county attorney that one of the parties

was respondent. Respondent's car was located in front of the home of an Omaha attorney, who does not otherwise appear in this matter. It was taken by orders of the county attorney and placed in a garage.

The next morning, December 8, 1953, between 4:30 and 5:30, respondent called a friend named Fulton on the telephone, related that he had been in a minor accident and, in effect, asked Fulton to take responsibility for the accident. Fulton agreed. Respondent also testified that about 8 a. m. that day he contacted the employer of Pilant, who reported that Pilant would be satisfied if respondent took "care of his car"; and that he then called his insurance company and told them the facts. He testified that at that time the patrolman, the insurance company, Pilant, and Pilant's employer knew that "I was the driver." That afternoon at 2:30 p. m. respondent went to the county attorney's office and gave an unsworn statement in which he stated, in effect, that he (respondent) was in the car half asleep, and that Fulton was driving.

After the statement was made, respondent asked the county attorney for advice as to what further to do and was told that he (respondent) should start telling the truth; that the county attorney knew respondent was driving the car; and that "by tomorrow we will be able to prove it." Respondent advised them that the next day Fulton would be in. Respondent then left the county attorney's office.

That evening (Tuesday) reporters called at the Fulton home and asked him for a statement about "your car accident." Fulton testified that the reporters told him that they knew he was not in the car and would be able to prove it "before morning." It appears that at that time or later it was definitely determined where Fulton had been during the day and evening of the accident. Fulton refused to give a statement and the reporters left. Fulton then called respondent and told him that the reporters had been there and he had re-

fused to give them a statement. Respondent told Fulton that they had an appointment the next morning with the county attorney "to make a statement." The next morning (Wednesday) Fulton made an appointment with his attorney, then he met respondent, and Fulton and respondent went to the scene of the accident, and Fulton "acquainted myself with it." They then went to the office of Fulton's attorney. Fulton testified that he went there prepared to testify that he had driven the car and to plead guilty to a charge, although he was not driving the respondent's car, was not in it, and was not anywhere near the scene of the accident when it occurred. Respondent testified that he (respondent) was going to pay the fine. Fulton's attorney interrogated them about who was driving the car. They both "just grinned." The attorney told Fulton that if he (Fulton) was going to testify that he was driving the car when he was not, that he could be held for perjury, and if he admitted driving the car that he might incriminate himself, and advised Fulton not to make a statement. Fulton and the attorney then went to the county attorney's office and Fulton refused to answer other than the preliminary questions.

The county attorney, then, on the basis of respondent's statement and Fulton's refusal to answer questions, prepared charges against Fulton for leaving the scene of an accident. The county attorney did not believe Fulton was the driver of the car, but preferred the charges against him to put the "squeeze" on respondent.

Fulton then went to the sheriff's office, posted bond, and was released.

The county attorney then advised respondent by telephone of what he had done; that he was endorsing respondent's name on the complaint as a witness; that if Fulton pleaded guilty he would file charges against both Fulton and respondent for obstructing justice; and that if respondent testified he would file perjury charges. Respondent agreed to come to the county attorney's

office. Fulton and his attorney then returned to the attorney's office where Palmer was waiting, "some discussion took place" between them, and respondent called the county attorney and advised him he was going to change his statement and "take my medicine." Respondent testified that he had made up his mind that "it wasn't going to go through." He went to the county attorney's office and gave them a statement that he (respondent) was driving the car.

Respondent testified that, after the statement was given, the county attorney said he "knew all the time" that respondent did it, and that respondent answered, "Why didn't you give me a hint about it then?" and if he had done so "I wouldn't have made that crazy statement."

The charges against Fulton were then dismissed, and respondent was charged with the offense.

Respondent pleaded not guilty. The facts were stipulated, a finding of guilt was made, and sentence was imposed and served.

The Advisory Committee found that respondent's conduct tended to impede or obstruct the administration of justice, and was in violation of canons 22, 29, 15, and 16.

Canon 22 provides in part that a lawyer is an officer of the law charged "with the duty of aiding in the administration of justice." Canon 29 provides in part: "He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice."

The Advisory Committee found that respondent was his own client and charged with the same responsibility as if acting for a client and as such had violated canon 15 which provides in part: "The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane"; and canon 16 which provides: "A lawyer should use his best efforts to restrain and to prevent his clients

from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct towards Courts, judicial officers, jurors, witnesses and suitors. If a client persists in such wrong-doing the lawyer should terminate their relation."

The Advisory Committee found also that respondent had violated section 7-105, R. R. S. 1943, as to the provisions that: "It is the duty of an attorney and counselor: * * * to employ, for the purpose of maintaining the cause confided to him, such means only as are consistent with the truth; * * * to abstain from all offensive practices * * *."

We agree with the conclusions of the Advisory Committee.

We have recently held: "The purpose of a disbarment proceeding is not so much to punish the lawyer as it is to determine in the public interest whether he should be permitted to practice.

"In admitting a lawyer, and granting him a license to practice law, it is on the implied understanding that the party receiving such license shall in all things demean himself in a proper manner and abstain from such practices as cannot fail to bring discredit upon himself, the profession, and the courts.

"The oath taken by him, as required by section 7-104, R. S. 1943, requires a lawyer to faithfully discharge his duties; uphold and obey the Constitution and laws of this state; observe established standards and codes of professional ethics and honor; maintain the respect due to courts of justice; and abstain from all offensive practices which cast reproach on the courts and the bar.

"A lawyer owes his first duty to the court. He assumed his obligations toward it before he ever had a client. He cannot serve two masters, and the one he has undertaken to serve primarily is the court.

"The ethical standards relating to the practice of law in this state are the canons of professional ethics of the American Bar Association and those which may

from time to time be approved by the Supreme Court." State ex rel. Nebraska State Bar Assn. v. Wiebusch, 153 Neb. 583, 45 N. W. 2d 583.

It is clear from this record that respondent sought at all times to avoid, not the penalty of the law for his act, but the impact of the publicity and notoriety upon himself as a lawyer and judge.

What he did was not the result of an impulse quickly regretted. Rather it was a designed plan, conceived by him alone, to manufacture false evidence, which was done; it was deliberately undertaken and carried out and persisted in until the futility of falsehood became quite apparent. The rigged evidence was not actually used in court, not because it was false, but because the truth "would out" and was out and respondent knew it. He told the truth, not because it was the truth, but because the time had come where the falsehood was no longer of service. We find nothing in this record to indicate other than that he told the truth because the falsehood "wasn't going to go through." The truth was used then, not to rectify what had been done, but to avoid the greater penalties which he had not contemplated. Had the truth not been developed and determined, we find nothing here to indicate that the false evidence would not have been used, but rather the record points clearly to the fact that it would have been so used.

Respondent led in this matter. Fulton followed. Fulton was the pliant participant in respondent's plan to debase the administration of justice. Each apparently had the same level of conception of the standards of the truth-seeking processes of our courts.

The controlling seriousness of what respondent did was the deliberate concocting of a false defense, his purpose being to use perjured testimony, if need be, to deceive the court, all to the end of escaping from the predicament in which he had placed himself. He desisted only under the compulsion of facts which proved the

complete falsity of his defense and the dangers of further prosecutions.

In the light of what has been heretofore said, we conclude that the admitted conduct of respondent disqualifies him for continuance as a member of the Bar of the State of Nebraska. Accordingly, the motion of relator for judgment of disbarment is sustained; respondent's order of admission to the Bar of the state is annulled; his license to practice therein is canceled; and his name is ordered stricken from the roll of lawyers in this state.

JUDGMENT OF DISBARMENT.