LUMBERMENS MUTUAL CASUALTY COMPANY, Appellant,

v.

Lola B. CHAPMAN, Appellee.

No. 7854.

United States Court of Appeals Fourth Circuit.

Argued June 16, 1959.

Decided Aug. 4, 1959.

C. F. Bagley, Jr., and L. E. Woods, Jr., Huntington, W. Va. (Campbell, McNeer & Woods, Huntington, W. Va., on brief), for appellant.

Norman E. Rood, Huntington, W. Va., for appellee.

Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and BRYAN, District Judge.

ALBERT V. BRYAN, District Judge.

Failure of the insured to "cooperate" in the defense of the appellee's personal injury action against the insured in the State court is pleaded in the present case by Lumbermens Mutual Casualty Company, the insurer, as the ground for its refusal to honor the appellee's judgment in the State action. Upon a jury's verdict acquitting the insured of any delinquency on this score, the District Court ordered the insurer to pay the judgment within the insurance limits. Lumbermens appeals on the assignment that the insured's want of cooperation conclusively appears from the admitted facts.

Collusion of the appellee and the insured in the preparation and trial of the State court case is the uncooperativeness charged. The appellee, Lola B. Chapman, was the sister-in-law of the insured, Melvin H. Foster. She was injured on the night of September 1, 1956 while riding as a guest in the insured automobile then operated by Foster. A condition of the policy is that the insured must "cooperate with the company and * * * assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits".

Having immediately notified Lumbermens of the accident, Foster on September 6 gave the insurer's adjuster a written account of the incident. In effect he said that while passing through a highway construction area near Milton, West Virginia, and driving on a strip of concrete covered with mud, his right front wheel suddenly dropped off the paved portion of the road and caused him to "cut back to my left". With the car thus veering sharply to the left, he explained, he lost control momentarily, and before regaining control, the car had crossed the highway and struck a pile of dirt. No other vehicle, he added, was involved in the mishap and his speed was about 40 miles per hour. On September 11, the adjuster also procured a statement in writing from the appellee. She told of having ridden with Foster to see her niece, his daughter, perform in a horse show at Milton, that the speed of the car did not seem excessive, that she was thrown against the windshield, but that she did not know how it happened "except that suddenly the car ran into a pile of dirt".

Her claim declined by Lumbermens, she employed an attorney. On July 22, 1957, in investigating the case before the institution of any action, he interviewed Foster. In a written statement at that time Foster related that while on the concrete strip he had become "distracted or turned my head to the right to say something to Lola Chapman and my car hit a mound of dirt blocking my lane of traffic". Again, "I was supposed to have turned to the left on to the dirt berm * * * I suppose the reason I did not see the dirt was because I had turned my head to the right. I was not driving over 25 or 30 M.P.H."

An action on behalf of Chapman was begun against Foster in a State court of West Virginia for damages of $45,000. The policy was for $20,000. Upon receiving the summons, Lumbermens wrote Foster on August 19, 1957 that it had employed an attorney "to defend you in this action" and asked him to cooperate with the attorney and the insurer. He was advised of the possibility of an award in a sum greater than his insurance and told that he might, at his expense, associate an attorney of his own with the insurer's. Foster was explicitly instructed not to give information "to any person

other than an accredited representative of this company". Thereafter the attorneys for Chapman and Lumbermens conferred from time to time. Foster did not retain a lawyer. Counsel for Chapman says that he dealt with the insurer's counsel in respect to the company's interest, and with Foster in regard to the latter's interest.

The evening before the trial day of October 1, 1957, Foster at the request of plaintiff's lawyer "extended through Miss Chapman" went to the lawyer's office. Present on this occasion were the plaintiff Lola Chapman, her lawyer and the defendant Foster. The lawyer readily conceded his purpose was "to get information to properly prepare this case". At that time Chapman assured Foster that in the event of a verdict beyond the insurance coverage she would release him of any responsibililty for the excess.

The attorney for the insurance company did not know of the last evening's meeting. Previously the settlement figure demanded by Chapman was $15,000. In a conference among the two lawyers and Foster before the start of the trial, plaintiff's attorney stated that his client had raised her composition figure to $20,000. This was notice to the insurer, he said, that he would also look to the company for any amount of the verdict beyond $20,000. His demand was refused.

The defendant was called as the plaintiff's first witness. Describing the accident on this night, he said it became necessary for him to turn to the left "where traffic laid out by the road commission was supposed to turn to the left from one lane of traffic over on the berm of the road and then immediately back to the right". The turn to the left was made, he recalled, but he did not complete the turn to the right because in coming "down off of the cement on to the berm" * * * "we slid" and struck a pile of dirt. Just before the collision his attention was drawn, he remembered, to a trailer ahead of him because it was hauling his daughter's horse; the unexpected

sight caused him to take his eyes off of the road to comment upon it to the plaintiff, sitting beside him; and the distraction let him run against a pile of earth.

In answer to the question Foster expressed the opinion he was legally responsible for the accident. An objection and a motion for a mistrial were overruled. The same question was asked, and the same answer given, when he was examined by insurer's attorney as defendant's witness. In his opening statement Chapman's attorney had described the occurrence just as Foster outlined it in testimony. The plaintiff's account closely paralleled Foster's.

Unfamiliar with this version of the accident and learning for the first time of Foster's visit the night before to the plaintiff's attorney, Lumbermens' counsel announced to Foster, out of the jury's hearing, that the company would continue to defend him but reserved the right to deny liability. Chapman's lawyer denied the efficacy of the reservation, saying that the company must "either get in the case or get out now". Plaintiff's attorney then called on the defendant himself to join in that position as his, and he did so.

A verdict of $7,500 was returned, and now is confirmed in a final judgment. With Lumbermens still denying all obligation under the policy, this action was commenced in the District Court. From the facts as just chronicled, all untraversed, the appellant contends that a breach of the policy's condition appears as a matter of law.

I. The events especially requiring scrutiny are these: the consultation between the defendant and the plaintiff's attorney without the knowledge of the attorney for the defendant's insurer; the release of the defendant, before he testified, of liability for any excess in the verdict; the cordiality in trial of the defendant with plaintiff's attorney; and a confession of liability by defendant—circumstances underscored by the relationship between the plaintiff and the

defendant of guest and host, sister-in-law and brother-in-law.

■ The first aid in our inquiry is provided by the jury's verdict in the District Court. It must be remembered that a full and bared account of the deportment of all of the participants was revealed to that jury. There the trial judge charged the jury clearly, comprehensively and with fitting emphasis upon the indispensable element of good faith. With these guides and in this light a verdict was reached adverse to the appellant. In this factual determination we can find no infirmity.

II. Nor do we find the verdict unacceptable in law. No attorney was engaged by the insurance company until August, 1957. Seemingly its counsel did not interrogate the insured on the facts after his retainment and before the trial. He relied on the statement given the insurance adjuster on September 6, 1956, almost a year past. He could not have been taken aback by the plaintiff's call of the defendant as a witness—a maneuver to be expected inasmuch as he was one of only two eye-witnesses—because a subpoena for the defendant had been issued by the plaintiff a week before the trial.

Comparing the statement made by Foster to plaintiff's counsel on July 22, 1957, before the institution of action, with his testimony, no substantial difference appears. Indeed, his testimony did not vary widely from his September, 1956 statement. Favorable to the insurer was the lower speed estimate given by Foster in his second statement—July 22, 1957.

If uncooperation by the insured can include the disparity between Lola Chapman's statement and her testimony, as the appellant urges, the conditions under which the statement was given must be noted. The adjuster called upon the plaintiff on the tenth day after the accident. She had been hospitalized and she was still suffering from a severe head injury as well as the loss of six front teeth as a result of the collision.

■ In our opinion the inconsistencies of neither Foster nor Chapman establish untruthfulness or collusion in either their statements or their testimony. Surely, they were not so material as to release the insurer. State Automobile Mut. Ins. Co. of Columbus, Ohio v. York, 4 Cir., 1939, 104 F.2d 730, 733, certiorari denied 308 U.S. 591, 60 S.Ct. 120, 84 L.Ed. 495.

Again, the insurance company is critical of plaintiff's counsel for approaching the defendant during his preparation for trial. When plaintiff's attorney took the statement from the defendant in July, 1957, neither the insurer nor the defendant had retained counsel. There was thus no impropriety, just as there was none on the part of the adjuster in seeking out the plaintiff for a statement in September, 1956. But the next meeting of plaintiff's attorney with the defendant occurred after the insurer's selected counsel had entered the case and had given notice of his interest to plaintiff's attorney.

■ It is an unseemly insensitiveness to the ethics of his calling for an attorney to interview an opposing party upon the case without the presence or permission of his counsel, if he knows him to be so represented. This is true although the party will be a witness and although a witness, generally, may be questioned without the leave of the other side. See Canons 9 and 39 of American Bar Association, and Opinion 187 of the Committee on Professional Ethics and Grievances (July 24, 1938), American Bar Association Opinions etc., 1957 ed. p. 371.

For the attorney, no justification can be found in a distinction between Foster insured and Foster uninsured. True, Lumbermens' letter had implied such a difference, but actually there was but a single liability and that the defendant's. The insurer did not have one liability, the defendant another. The company had convenanted to defend the insured's entire and whole liability. A separation existed only in the extent of their responsibility under a judgment.

The transgression was, however, the attorney's and not the insured's. The

unbecoming conduct of the attorney ought not to be laid to his opposite party. The latter is hardly chargeable with the knowledge that the conference was uncanonical. Nevertheless, ordinary candor demanded that he inform his insurer or its counsel of the conference. In this respect the insured did fail in his obligation to his insurer.

But we cannot conclude that in the circumstances his omission was so substantial as to relieve the insurer from its policy. The insurer had warned him of his uninsured exposure when it admonished him not to talk with anyone save his insurer. With his jeopardy so sharply impressed upon him by the insurer, and entitled as he was to act without a lawyer, we cannot declare that the insured forfeited his policy protection by acceding to the request of the opposing counsel for a conference. This is likewise true of his procurement of a release from so much of any verdict as was above the coverage. The fact of the release could possibly intimate some influence upon his testimony; but it was also fairly within the invitation of the insurer that he in part defend himself.

Plaintiff's attorney and the insured at the trial were obviously too informal, too cordial. Yet in a trial between friendly in-laws, we hesitate to hold the defendant to an artificial estrangement and indifference. Again, simply because it helps his relative he is nonetheless obligated to speak the truth. It is true that the agreement of the insured's testimony with the contentions of the plaintiff might be looked upon as unduly assisting her. On the contrary, just as probably and indeed presumptively, it was entirely truthful. State Automobile Mut. Ins. Co. of Columbus, Ohio v. York, supra, 4 Cir., 104 F.2d 730, 734.

The jury has found no duplicity on the part of the insured—at least it has found that the evidence is as consistent with innocence as with collusion. We agree with the trial judge that the verdict ought not to be disturbed.

Affirmed.