STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR
ASSOCIATION, RELATOR, V. JOHN P. JENSEN, RESPONDENT.
105 N. W. 2d 459

Filed October 14, 1960. No. 34487.

(1)

*Clarence S. Beck,* Attorney General, and *Gerald S. Vitamvas,* for relator.

*Joseph T. Votava, Paine & Paine,* and *John P. Jensen,* for respondent.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an original disciplinary proceeding brought in the name of the State of Nebraska on the relation of the Nebraska State Bar Association, relator, against John P. Jensen, a lawyer duly admitted and licensed to practice his profession in this state. On the filing of the complaint the matter was duly referred to a referee for hearing, report, and recommendation. Hearing was had, report made, and the referee found the respondent guilty of unethical and unprofessional conduct. The referee made no special recommendation, but left the matter of discipline to this court. Exceptions were taken by the respondent to both the referee's findings of fact and the recommendation.

The duty rests on this court to maintain the integrity of the legal profession by disciplining lawyers who indulge in practices designed to bring the courts or the profession into disrepute, or to perpetrate fraud on the courts, or to corrupt and defeat the administration of justice. We necessarily review the evidence adduced in such proceedings de novo to determine if discipline should be imposed, and, if it should, the extent thereof. See State ex rel. Nebraska State Bar Assn. v. Fisher, 170 Neb. 483, 103 N. W. 2d 325.

Prior to setting forth certain principles which are applicable in disciplinary proceedings, we make reference to certain motions and stipulations filed in this court which motions this court has not ruled upon or disposed of.

On December 24, 1958, there was filed in this court a stipulation wherein the parties, pursuant to an oral agreement made December 5, 1958, and concurred in by the referee, agreed that this cause be set for hear-

ing before the referee on April 20, 1959.

On January 17, 1959, the parties stipulated that all of the evidence taken before the Committee on Inquiry on July 18, and August 6, 1957, all of the evidence offered at the hearing before the Advisory Committee on May 23, 1958, and all depositions taken by either party since these proceedings were filed in this court might be offered and received in evidence the same as if said witnesses were present in court and testified, all subject to the objections as to relevancy, competency, and materiality.

On March 23, 1959, by stipulation of the parties, it was agreed that the relator's objections to the respondent's request for admissions, and relator's objections to respondent's request for interrogatories previously filed in the office of the Clerk of the Supreme Court March 11, 1959, and noticed before this court for hearing on April 6, 1959, might be submitted to the referee for hearing and determination instead of to this court, at such time and place as the referee might determine or designate.

On February 28, 1959, the respondent served request for interrogatories and request for admissions on counsel for the relator. The requests for interrogatories and admissions were of great length and contained certain subparts. The relator made response to some of the requests, a part of which were denied for the reasons stated therein, and the balance were objected to. Such objections were sustained by the referee on April 10, 1959.

On April 17, 1959, respondent filed a motion in this court that this court enter an order holding that the responses of the relator, in legal effect, constituted admissions by the relator of the requests of the respondent and might be relied upon by the respondent as admissions of the relator.

On April 17, 1959, the respondent filed a motion requesting this court to review the order of the referee

as to objections to request for interrogatories and request for admissions, and to rule on the question as to whether or not the respondent was entitled to discovery by request for admissions to interrogatories as provided for in sections 25-1267.37 to 25-1267.39, R. R. S. 1943. The above motions were noted for hearing before this court and were not ruled on for the reason that the matters contained therein were referred to and were before the referee for determination.

Under the circumstances, the motions of the respondent filed in this court on April 17, 1959, were not timely filed and are hereby overruled.

The requests for admissions, which were objected to, were responded to by the relator in good faith as contemplated by section 25-1267.41, R. R. S. 1943. The denied parts were honestly set forth and the reasons given why the relator could not truthfully admit or deny the matter in compliance with subdivision (1) of said section. The trial before the referee proceeded on the theory that such responses were adequate, and evidence was introduced for and against the matters the respondent now seeks to have conclusively established. The respondent's objections should have been directed to the referee.

In the light of the foregoing, we find that the respondent was in no way prejudiced.

On April 17, 1959, the respondent filed a motion in this court for summary judgment. The respondent also moved for a continuance before the referee of this matter until such time as a motion for summary judgment had been ruled upon and until such time as a number of other motions also filed in this court had been ruled upon, and for other reasons not necessary to mention. This motion was overruled.

An application for continuance is addressed to the sound discretion of the court, and the ruling thereon will not be disturbed in the absence of a clear abuse

of discretion. Stratton v. Dole, 45 Neb. 472, 63 N. W., 875.

The referee being an arm of the court, his actions providing for and holding a hearing are controlled by, the rules relating to such proceedings in a court. The, referee therefore did not err in denying a continuance.

With reference to the motion for summary judg-, ment, respondent states that there have been no counter showings filed by the relator, therefore it must be presumed that the showings attached to the motion for summary judgment have been accepted as correct by the relator. This motion was not ruled on by this court for the reason that the whole matter had been referred to the referee.

Section 25-1332, R. R. S. 1943, provides in part: "The adverse party prior to the day of hearing may serve, opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The complaint, the answer thereto, and the reply, clearly show that there is a genuine issue of fact to be determined in the instant case, as well as other matters appearing in the transcript relating thereto. The motion for summary judgment is overruled. See Rehn v. Bingaman, 157 Neb. 467, 59 N. W. 2d 614.

On July 3, 1958, the respondent filed a motion in this court that the charges made against him were indefinite and uncertain, and moved that the relator be required to make the complaint more definite and certain. The primary objection to the complaint was that there was a failure to set forth which specific canons of professional ethics the respondent violated, and to set forth what standard of professional conduct, rules or regulations, statutes and laws were vio--

lated by the respondent. On September 26, 1958, this court overruled the above motion.

Revised Rules of the Supreme Court, Part III, Disciplinary Proceedings, Rule 3, provides in part: "Proceedings shall be initiated by the relator filing a verified complaint setting forth the grounds thereof with reasonable definiteness."

In the case of In re Becker, 16 Ill. 2d 488, 158 N. E. 2d 753, it was held: "A disciplinary proceeding is not a lawsuit with formalities of pleading, nor can technicalities be invoked to defeat the charges where undisputed facts show conduct which is ethically wrong, * * *." See, also, 7 C. J. S., Attorney and Client, § 31, p. 775.

There is no doubt but that the respondent knew the charge or charges he was defending against. We find no merit in the respondent's contention.

Considering the respondent's contentions, we set forth certain principles which are applicable in disciplinary proceedings.

"Disbarment proceedings are essentially civil and not criminal in character and the recognized rules governing civil practice are applicable thereto." State ex rel. Nebraska State Bar Assn. v. Fisher, *supra.*

In a proceeding for the disbarment of an attorney at law the presumption of innocence applies, and the culpability of the person charged must be established by a clear preponderance of the evidence. See State ex rel. Nebraska State Bar Assn. v. Pinkett, 157 Neb. 509, 60 N. W. 2d 641. That is, the court should be satisfied to a reasonable certainty that the charges are true. See, Revised Rules of the Supreme Court, Part III, Disciplinary Proceedings, Rule 1; State ex rel. Nebraska State Bar Assn. v. Price, 144 Neb. 542, 13 N. W. 2d 714; State ex rel. Nebraska State Bar Assn. v. Gudmundsen, 145 Neb. 324, 16 N. W. 2d 474.

The oath taken by a lawyer, as required by section 7-104, R. R. S. 1943, requires him to faithfully discharge

his duties; uphold and obey the Constitution and laws of this state; observe established standards and codes of professional ethics and honor; maintain the respect due to courts of justice; and abstain from all offensive practices which cast reproach on the courts and the bar. A lawyer owes his first duty to the court. He assumed his obligations toward it before he ever had a client. He cannot serve two masters, and the one he has undertaken to serve primarily is the court. See State ex rel. Nebraska State Bar Assn. v. Palmer, 160 Neb. 786, 71 N. W. 2d 491.

A duty rests on the courts to maintain the integrity of the legal profession by disbarring or suspending attorneys who indulge in practices designed to bring the courts or the profession into disrepute, or to perpetrate a fraud on the courts, or to corrupt and defeat the administration of justice. See State ex rel. Nebraska State Bar Assn. v. Niklaus, 149 Neb. 859, 33 N. W. 2d 145.

In granting a license to practice law it is on the implied understanding that the party receiving it shall in all things demean himself in a proper manner, and abstain from such practices as cannot fail to bring discredit upon himself, the profession, and the courts. See State ex rel. Sorensen v. Scoville, 123 Neb. 457, 243 N. W. 269.

The ethical standards relating to the practice of law in this state are the Canons of Professional Ethics of the American Bar Association which have been adopted by the Supreme Court of this state and those which may from time to time be approved by the Supreme Court of this state. State ex rel. Nebraska State Bar Assn. v. Wiebusch, 153 Neb. 583, 45 N. W. 2d 583.

Any conduct on the part of an attorney evidencing his unfitness for the confidence and trust which attend the relationship of attorney and client or which is unworthy of public confidence constitutes a ground for suspension or disbarment. State ex rel. Nebraska State

Bar Assn. v. Richards, 165 Neb. 80, 84 N. W. 2d 136.

Violation of codes of ethics or any conduct on the part of an attorney in his professional capacity which tends to bring reproach on the legal profession constitutes ground for suspension or disbarment. State ex rel. Nebraska State Bar Assn. v. Richards, *supra.*

The purpose of a disbarment proceeding is not so much to punish the attorney as it is to determine in the public interest whether he should be permitted to practice law. State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra.*

While this case is for trial de novo in this court, we recognize the rule that the referee heard and saw the witnesses as they testified. He had a better opportunity to appraise the credibility of the witnesses than does this court. While this court tries appeals in equity de novo, we must necessarily consider the findings of the referee on matters that are in irreconcilable conflict. Jensen v. Manthe, 168 Neb. 361, 95 N. W. 2d 699; Dunbier v. Rafert, 170 Neb. 570, 103 N. W. 2d 814.

The respondent complains that the referee unduly interrogated witnesses, and indicates that in interrogating the witnesses the referee did so unfairly and not impartially.

There is no impropriety in a trial court interrogating witnesses regarding a fact under investigation, when the tendency is only to develop the truth, and is calculated in nowise to influence the jury, save as the testimony will assist it to arrive at a correct conclusion on the questions of facts in issue. Coyle v. Stopak, 165 Neb. 594, 86 N. W. 2d 758.

In this action the referee is the trier of facts. The referee is charged with the duty to determine the truth and has the right to question witnesses on both sides of the litigation, which he did. We find no error in the referee's action in such respect. In any event, all the evidence before the referee is before this court to review.

This action charges the respondent with unethical and unprofessional conduct in five separate matters. The answer is of extensive length and comprises a recital of facts in each charge to considerable extent. However, the answer to each charge may be considered as a denial of unethical or unprofessional conduct on the part of the respondent. The reply of the relator .contains certain admissions of fact as pleaded in the respondent's answer and denies other facts appearing therein.

The record in this case is rather voluminous. Without repeating all the details and testimony of this lengthy record, we think the following résumé of certain salient, significant facts is sufficient to illustrate and substantiate our decision in this matter.

Paragraph V of the complaint charged the respondent with unethical and unprofessional conduct for failure to deliver the last will and testament executed by Lydia F. Evans and left by her in the respondent's possession after she had made repeated requests of him to deliver to her her last will and codicil attached thereto. The record shows that the respondent first became acquainted with Lydia F. Evans when he drew a will for her in April 1948. There was a petition for the appointment of a guardian filed in the county court of Buffalo County by her son Franklin F. Evans. An answer was filed to this petition on April 26, 1948. This guardianship proceeding was dismissed. The respondent transacted other legal business for Lydia F. Evans on occasions. Later, Lydia F. Evans obtained the will executed by her in April 1948, and destroyed it. Mrs. Evans had three children living, Martha Priebe, Galen Evans, and Franklin F. Evans, and three nephews living, Samuel M. Forney, Maurice May, and John May. Samuel M. Forney was an ordained minister of the Church of the Brethern, the same church Mrs. Evans attended. In January 1951, Samuel M. Forney made an appointment for his aunt, Lydia F. Evans, to

go the office of the respondent to make a will. Forney and the respondent picked her up in the respondent's car. Lydia F. Evans executed a last will and testament on January 22, 1951, and nominated the respondent as executor, giving him full power, at his discretion, to sell at public or private sale any real or personal property without order of the court, and to settle, compromise, or to adjust all claims, charges, and debts in favor of or against the estate. On February 8, 1951, Lydia F. Evans had the respondent make a codicil to her will. The respondent testified that at the time Lydia F. Evans executed the will of January 22, 1951, he wanted to know his specific instructions with reference to the will; that he did not want to be involved in a situation where anybody could come to his office and get the will; and that Lydia F. Evans' instructions to him were as follows: "Mr. Jensen, this I think is the last will that I will ever make. This will is to be kept by you. You are not to give it to anyone. I will not send anyone for it. And if I come up here with anyone, you are not to give it either to them or to me." It appears that the wills executed by Lydia F. Evans in 1948 and 1951 were quite similar. Both wills made provisions for charitable bequests to the church and church-related beneficiaries. Lydia F. Evans' nephew, Samuel M. Forney, was the residuary legatee under the will made January 22, 1951.

On or about January 27, 1951, Franklin F. Evans saw his mother, Lydia F. Evans, going to the respondent's office, so he followed her to the office. Mrs. Evans requested her will, but the lady at the desk told Mrs. Evans she could not give the will to her. Thereafter Franklin and his mother left the respondent's office. At another time, about a week or so later, Franklin F. Evans again saw his mother going to respondent's office, and he again followed her to the office. Mrs. Evans was talking to the respondent's law partner, and Franklin heard her ask for the will. She

received a copy of the will, and Mrs. Evans stated that she wanted the signed copy, but respondent's partner would not give her the original will.

On June 4, 1951, Lydia F. Evans filed a petition in the county court of Buffalo County alleging that she was 82 years of age and, by reason of age and health, she was unable to handle all her business affairs, to wit, the management of her property and the collection of rents, without a conservator to advise her and act for her in such matters, and alleged that her son Franklin F. Evans was a suitable person to act as such conservator. She was represented in such proceedings by the respondent and attorney Worlock. Franklin served as conservator of the estate of Lydia F. Evans until May 20, 1952, when, at her request, the conservatorship was terminated. On December 3, 1952, Worlock mailed the respondent a check for $150 as his part of the attorneys' fees collected in the conservatorship proceedings. There is no question but that the respondent knew and had notice of such proceedings and the manner in which the same were handled and concluded.

Franklin F. Evans testified that on September 14, 1951, he and his mother went to the respondent's office, and when they arrived at said office his mother said she wanted her will. The respondent shouted: "You're not fit to make another will," and he would not give up the will. He further said that he had the interests of other people to protect who were beneficiaries under the will; and that he could not give the will up without a court order. The respondent denied that he ever stated that he would not deliver the will because he had to protect the interests of other people who were beneficiaries under the will.

It appears that on September 14, 1951, both Franklin F. Evans and his mother asked the respondent for Mrs. Evans' will. The respondent testified that on September 14, 1951, when Franklin and Lydia F. Evans were in his office, Franklin was angry and wanted the respondent

to produce the will immediately and give it to his mother. Franklin said that she wanted it turned over to him. The respondent told Franklin that he did not believe, as conservator, Franklin was entitled to the will. The respondent said: "Aunt Liddy, * * * do you want me to give this son of yours this will?" She said: "Well, yes." She further said that Franklin told her if she would get the will and give it to him he would have it fixed so she could give her property to the people to whom she wanted to give it. There ensued some sort of argument and as a result Franklin F. Evans called attorney Worlock to come to the respondent's office. When Worlock arrived, the respondent, Lydia F. Evans, and Franklin F. Evans were in respondent's office. Worlock said: "John, why don't you give Mrs. Evans her will? She is entitled to it." Instead of answering Worlock directly, the respondent said: "Aunt Lydia, I am not going to give you this will. If I give it to you, you will destroy it; you will not be in a position to make another will, and I have the interests of these parties to protect, and I am not going to give you the will."

Worlock testified that he advised Lydia F. Evans to go to the respondent's office and ask for the will. After this conversation in the respondent's office on September 14, 1951, Worlock, on September 15, 1951, at Lydia F. Evans' request, prepared a revocation of the will of Lydia F. Evans dated January 22, 1951, and the codicil thereto. With respect to the revocation of the will, Worlock talked to Lydia F. Evans alone. She told Worlock that she wanted that will and codicil destroyed; that she did not want another will; that she wanted to revoke her will and the codicil thereto; and that she wanted her property to go to her children.

After the conversation had in the respondent's office between Franklin F. Evans, Lydia F. Evans, and Worlock, the respondent called Samuel M. Forney and told him that Franklin F. Evans had been to the respondent's office trying to get the will, and suggested that Forney

do whatever he felt necessary to protect the rights of Mrs. Evans, Forney, or anyone else. The respondent also called Maurice May and told him to do whatever was necessary to protect his rights relating to the will.

There is testimony by witnesses in behalf of the respondent that under the instructions given to the respondent by Lydia F. Evans it would have been wrong, under the circumstances, for the respondent to deliver the will to Lydia F. Evans.

Lydia F. Evans told her son Galen Evans that she had gone to respondent's office numerous times to get her will, and the respondent would not give it to her. Lydia F. Evans also told several of her friends during the summer of 1951 that the respondent would not let her have her will. She also told her daughter that the respondent would not give her her will and she wanted it back. She also requested her son Franklin to help her get her will back. Later Lydia F. Evans conveyed and transferred her property to her children.

On June 25, 1954, Lydia F. Evans died. The respondent filed a petition in the county court of Buffalo County July 3, 1954, for the probate of the will of Lydia F. Evans, deceased, executed on January 22, 1951. Objections were filed to the probate of the will, together with a copy of the revocation of the will and codicil, on July 30, 1954. Maurice May and the respondent filed a reply on May 11, 1955, showing Dryden and Jensen (the latter being the respondent), and Munro and Parker, as attorneys. The county court rendered judgment against the respondent, and an appeal was taken to the district court. The proponents were represented by attorneys Munro and Parker in the district court. The district court sustained the motion of the contestants against the proponents in part, and instructed the jury that the mental capacity of Lydia F. Evans at the time of the execution of the revocation of her last will and testament had been established by the evidence, and limited the issue in the case to undue influence. The jury found

against the proponents on the issue of undue influence, and this judgment was affirmed by this court. See Jensen v. Priebe, 163 Neb. 481, 80 N. W. 2d 127.

From a review of the record relating to the Evans matter, the evidence is overwhelming that during the time Lydia F. Evans executed her will on January 22, 1951, and the codicil in February 1951, she was mentally competent to do so; and that when she requested the respondent to deliver her will to her on September 14, 1951, and at the time she executed the revocation of her will and codicil on September 15, 1951, Lydia F. Evans was competent to perform such acts. Samuel M. Forney testified that he did not remember a time when Lydia F. Evans was incompetent; and that she was a strong-minded woman, had a mind of her own, knew the nature and extent of her property, and the natural objects of her bounty. Galen Evans, a son of Lydia F. Evans, testified that his mother had a mind of her own. Martha Priebe, her daughter, testified that her mother had a will of her own. In fact, there is no competent evidence that up to the date of her death Lydia F. Evans was incompetent to make a will or revoke a will she had made, or that she could be unduly influenced with reference to her property at any time.

At the time Lydia F. Evans executed her will on January 22, 1951, she was possessed of real estate and personal property of the approximate value of $125,000. The respondent had represented her over a period of years prior to January 22, 1951, and knew the nature, extent, and value of her property. The respondent made no attempt to contact Lydia F. Evans after September 14, 1951, to determine whether she wanted her will, or to suggest that if she would come to the office alone he would deliver it to her, although she lived until June 25, 1954. The record is clear that Lydia F. Evans herself, personally, requested the respondent to deliver her will to her.

In 7 C. J. S., Attorney and Client, § 19, p. 733, it is

said: "Any conduct on the part of an attorney evidencing his unfitness for the confidence and trust which attend the relationship of attorney and client or unworthy of public confidence constitutes a ground for suspension or disbarment." See, also, State ex rel. Nebraska State Bar Assn. v. Wiebusch, *supra.*

"Violation of codes of ethics or any conduct on the part of an attorney in his professional capacity which tends to bring reproach on the legal profession constitutes ground for suspension or disbarment." 7 C. J. S., Attorney and Client, § 23, p. 741.

We conclude that under the evidence the respondent was duty bound to give Lydia F. Evans her will upon her demand for it. There is no legal or logical reason why the respondent should not have complied with this request. We are in accord with the referee's finding on this matter that the respondent was guilty of unethical and unprofessional conduct.

With reference to paragraph No. VI of the complaint titled the Bentley matter, the complaint alleged in part that on September 14, 1953, the respondent was attorney for William Bentley in the matter of the guardianship of Lillian Bentley alleged to be mentally incompetent, a proceeding in the county court of Buffalo County wherein William Bentley, the son of Lillian Bentley, petitioned that his mother by placed under guardianship. This petition was filed in the spring of 1953, and at all times during said action Lillian Bentley was represented by Ward W. Minor, an attorney at Kearney, Nebraska. The complaint alleged that the respondent went to the Bentley home for the purpose of obtaining a statement from Mrs. Bentley, knowing that she was represented by counsel, and to obtain such a statement without the permission of her counsel. Lillian Bentley and her husband, Bert Bentley, resisted this guardianship. The respondent and Minor discussed this case prior to trial, during the latter part of June or first part of July 1953, at which time Minor suggested

that the respondent talk to Dr. Wiltse who was Lillian Bentley's doctor. Minor testified that he never at any time gave respondent permission to talk to his client, Lillian Bentley, or to her husband Bert Bentley; that he not recall giving permission to the respondent to talk to his client Lillian Bentley; and that he did not recall any other conversation with the respondent about this matter prior to the discussion setting the case for trial, or with respondent's secretary being present, or any conversation between him and the respondent. The respondent testified that Minor told him to see Dr. Wiltse and get a report from him, and early in March 1953, he saw Dr. Wiltse. The respondent did receive a report from Dr. Wiltse dated May 13, 1953. The doctor's report was to the effect that Lillian Bentley's mind was clear; and that she was competent and could comprehend. The respondent further testified that toward the end of June or July 1953, he met Minor in the courthouse and told Minor that William Bentley had told the respondent four or five times that his mother wanted to see the respondent; that there were also certain persons who cared for Lillian Bentley and knew about her condition; and that Minor told the respondent to go and see his client, Mrs. Bentley. The respondent testified that at a later date he telephoned Minor with reference to seeing Mrs. Bentley and told him that if nothing was wrong with her mind, or if she was competent, he would dismiss the guardianship proceedings, and Minor replied: "It's alright; I am sure you will see she is o.k." The respondent's secretary corroborated the respondent's testimony as above set forth, in most respects.

The respondent made arrangements with David Drage, a deputy sheriff of Buffalo County, to take respondent and his secretary to see Mrs. Bentley who lived at Shelton, Nebraska. The reason for this was that Bert Bentley was presumed to be a violent person. The respondent told William Bentley and Drage that he had permission from Minor to talk to Mrs. Bentley. The group

picked up William Bentley in Shelton on the way to the Bentley home. The respondent's purpose in talking to Mrs. Bentley was to see if she was mentally competent, and if he thought she was he was going to dismiss the guardianship proceedings. When the group arrived at the Bentley home, the respondent asked Drage to go into the house first and ask Mrs. Bentley if she wanted to see him. Drage went into the house, and came out and told the respondent that Mrs. Bentley wanted to see him. The respondent went into the house with Drage and met Bert Bentley a few feet inside the kitchen. Bert Bentley told them he did not want anyone talking to his wife. The respondent and Drage then left the house. The witnesses whose statements respondent wanted to take were not present, and the statements were not taken. On no occasion did Mrs. Bentley tell the respondent to get out of the house and stay out, and there was no conversation between the respondent and Lillian Bentley.

The respondent introduced into evidence an exhibit, the deposition of Robert L. Haines, and certain exhibits in addition thereto. The respondent told Drage that he wanted to take a statement from Mrs. Bentley, but did not tell him what it was. In a statement Drage made shortly after the incident he related a different story than that told by him before the Committee on Inquiry. Drage stated that when the party arrived at the house, all three of them got out of the car and proceeded up to the porch where they were met by Bert Bentley. Bert Bentley told them that Drage could go in to see Mrs. Bentley, but the others could not. Drage went into the house and was visiting with Mrs. Bentley when William Bentley, the respondent, and the respondent's secretary came in and stopped just inside the door. Bert Bentley told them to get out. The respondent announced to Bert Bentley: "I am here to take an affidavit from your wife." Bert Bentley refused to allow him to talk to his wife, and an altercation ensued. The respondent and

his party left. Lillian Bentley also told them to get out and leave her alone. Mrs. Bentley's statement was taken by Robert L. Haines, wherein she stated that she never invited the respondent to her home, nor did she give him permission to come to her home, and never gave her attorney permission for the respondent to come to her home. Subsequently, Bert Bentley died.

It is true, the respondent did not have the opportunity to interview Lillian Bentley. He had previously received a report from Dr. Wiltse in which the doctor reported the state of Mrs. Bentley's mind and that it was clear, and she was able to comprehend. Also in this report the doctor explained that Mrs. Bentley previously suffered a stroke and her condition had improved markedly from February 9, 1953. The respondent admits that he intended to talk to Mrs. Bentley, but denies that he intended to take a statement from her.

The relator's contention is that the respondent never received Ward Minor's permission to interview his client, and the mere fact that the respondent was prevented by Bert Bentley from keeping his announced plan does not prevent or excuse him from a violation of Canon 9, Canons of Professional Ethics.

Canon 9 provides in part: "Negotiations With Opposite Party. A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel." See, also, Lumbermens Mutual Casualty Co. v. Chapman, 269 F. 2d 478; Turner v. State Bar, 36 Cal. 2d 155, 222 P. 2d 857.

In the light of all the testimony relating to the Bentley matter, we conclude that the respondent violated the Code of Professional Ethics by his conduct, as determined by the referee. As the respondent stated, he could have taken the deposition of Lillian Bentley. True, the evidence in relation to this charge is in irreconcilable conflict, but we, under the rule heretofore announced

relating to an equity action, conclude that the referee did not err as contended for by the respondent.

Paragraph No. IV of the complaint relates to the Molzen matter. The respondent represented Hazel Molzen in a divorce case. She employed him on March 22, 1951. He prepared a petition for divorce in her behalf and filed it on the same date. Her husband, Cecil W. Molzen, was represented by attorney Louis A. Holmes. The defendant's answer was filed June 2, 1951. On July 31, 1951, a decree was entered showing that a trial was had at which evidence was offered by the plaintiff but none by the defendant. On the same day there was filed an agreement in contemplation of divorce signed by Cecil W. Molzen in Minnesota on June 19, 1951. Also on July 31, 1951, the respondent's firm filed an attorney's lien in the district court. The respondent told Mrs. Molzen that the only fair thing to do, since the defendant's property was in Minnesota, was that he should ask the court to fix his attorney's lien at 15 percent, and that he would put it in the decree. Respondent prepared the decree before going into court on the date the trial was had. There was no testimony about attorney's fees at the hearing at the time the divorce was granted to the plaintiff. The respondent had not discussed this 15 percent attorney's lien provision with the district judge before he prepared the decree, but had discussed the matter with his client.

The parties to this divorce action had entered into an agreement and a property settlement whereby the plaintiff was to receive $5,500. Of this amount, $1,000 was received by her as a result of an assignment of a loan made by Cecil W. Molzen, her husband, to her brother. The respondent received in fees for this action the amount of $772.31. On December 4, 1951, Mrs. Molzen discharged the respondent and the members of his firm as attorneys representing her. A motion was filed in her behalf to strike from the decree the provision as follows: "Plaintiff's attorney is given a lien on amounts

due and owing from defendant to plaintiff in the amount of 15%." This motion was based on the fact that such a provision was beyond the authority of the court to enter in the decree, because the same was not shown by the pleadings. The respondent filed his application for leave to intervene, which was granted. The respondent, on April 3, 1953, filed an answer to the plaintiff's motion to strike, in which the respondent asserted his right to the 15 percent attorney's fee lien. The answer also affirmed the fact that the respondent had discussed the 15 percent provision appearing in the decree with his client prior to the entry of the decree. On February 5, 1954, the district court found that the 15 percent provision was included in the journal entry without any evidence having been taken thereon, that no actual agreement had been made, and struck such provision mentioned above from the decree.

The relator contends that the provision set forth in the decree charging 15 percent of the amount of alimony actually to be collected was, in effect, a contingent fee contract. In addition, the relator contends that the entry of the provision in the decree constituted a fraud upon the court.

In State ex rel. Nebraska State Bar Assn. v. Dunker, 160 Neb. 779, 71 N. W. 2d 502, this court said: "Generally, a contract executed before decree is rendered for payment of attorney's fees in a divorce action contingent upon the amount of alimony to be subsequently obtained upon the award of a divorce is void as against public policy, since because of the lawyer's personal interest in the litigation it tends to prevent a reconciliation between the parties and destroy the family relationship." Annotation, 30 A. L. R. 188, cites and discusses authorities supporting such statement. They are too numerous to cite here. See, Jordan v. Westerman, 62 Mich. 170, 28 N. W. 826, 4 Am. S. R. 836; McCurdy v. Dillon, 135 Mich. 678, 98 N. W. 746; 17 C. J.

S., Contracts, § 235, p. 618; 5 Am. Jur., Attorneys at Law, § 166, p. 361.

The respondent contends that there was no contract for fees prior to the day the matter was terminated; that, in effect, the provision for 15 percent applied only to the alimony collected after the property settlement was entered into. The defendant, Cecil W. Molzen, had loaned $1,000 to the plaintiff's brother. As a part of the property settlement prior to the divorce, this $1,000 was assigned to Mrs. Molzen. Mrs. Molzen had this $1,000 from her brother and did not want Cecil W. Molzen trying to collect this amount from her brother again. This $1,000 had been paid to Mrs. Molzen a year before when she was in the hospital. No legal services were required to collect this $1,000, other than to include the item in the property settlement agreement, and this fact is admitted by the respondent. It is apparent that the respondent was basing his percentage fee on the total amount of alimony awarded and not just the collection of awarded alimony after the judgment had been rendered. This is wrong and unethical under the holding in State ex rel. Nebraska State Bar Assn. v. Dunker, *supra.*

The respondent prepared the decree and inserted this provision in it. He had not discussed the matter with the district judge before inserting it in the decree. No evidence was presented on the divorce trial concerning the fee. On February 5, 1954, the court found that the 15 percent provision was included in the journal entry without evidence being taken thereon and that no actual agreement had been made, and the court struck that provision from the decree. While it may be assumed that the district judge read the decree, the respondent failed to fully inform the judge as to its provision improperly incorporated therein.

Canon 22 of the Canons of Professional Ethics, provides in part: "The conduct of the lawyer before the

Court and with other lawyers should be characterized by candor and fairness."

We conclude that in the Molzen matter the conduct of the respondent was such that he acted in an unprofessional manner and perpetrated a form of fraud upon the court within the provisions of Canon 22 of the Canons of Professional Ethics. The referee so found and we are in accord with his findings in such respect.

The respondent asserts that the relator offered in evidence all of the testimony of the parties offered before the Committee on Inquiry, all of the evidence in the case of Jensen v. Priebe, *supra*, and other evidence; and that the relator knew, at the time of making such offers, exactly what evidence was contained therein.

The respondent cites Edgar v. Omaha Public Power Dist., 166 Neb. 452, 89 N. W. 2d 238, wherein this court said: "As a general rule, a party calling a witness vouches for his credibility and is ordinarily bound by any evidence he gives which is not contradicted or shown to be unreliable by evidence which would justify the trier of facts in arriving at a different conclusion." See, also, 58 Am. Jur., Witnesses, § 796, p. 441.

At the trial of this matter before the referee, the relator offered the proceedings before the Committee on Inquiry in evidence, pursuant to a stipulation entered into by the parties herein. The respondent first objected to the reception of this evidence, but subsequently withdrew his objection as to a part of the testimony, and has not claimed error or improper reception of evidence as to the balance thereof.

This court, in Krull v. Arman, 110 Neb. 70, 192 N. W. 961, said, quoting from Thorp v. Leibrecht, 56 N. J. Eq. 499, 39 A. 361: "While a plaintiff who calls defendants as his witnesses cannot impeach their character for veracity generally, he may show that the whole or any part of what they have sworn to is untrue either by their own examination and the improbability of their own story or by other contradictory evidence

material to the case." See, also, Davis v. Dennert, 162 Neb. 65, 75 N. W. 2d 112; Trask v. Klein, 150 Neb. 316, 34 N. W. 2d 396; Zimman v. Miller Hotel Co., 95 Neb. 809, 146 N. W. 1030.

Under the true rule herein set forth, while a witness may not be impeached by the party calling him, the testimony of such a witness may be contradicted. The evidence submitted by the relator certainly contradicted the testimony of the respondent and was entitled to as much weight as the referee concluded it merited, and as this court concluded it merited on a trial de novo.

The respondent raises the defense of laches, contending that he was prejudiced by the delay in filing and in investigating the charges as shown by the complaint.

In State ex rel. Nebraska State Bar Assn. v. Bates, 162 Neb. 652, 77 N. W. 2d 302, this court said: "Laches is an equitable doctrine and it does not result from the mere passage of time."

Lapse of time since the acts on which a disciplinary proceeding is based is generally not available to the respondent as a defense. See State ex rel. Nebraska State Bar Assn. v. Merten, 142 Neb. 780, 7 N. W. 2d 874.

In State ex rel. Nebraska State Bar Assn. v. Bates, *supra,* the court pointed out that the conduct of the respondent in that case continued until July 7, 1948, while the complaint before the Committee on Inquiry was made and filed in November 1954. It appears that in the Bates case a period of a little over 6 years had elapsed. In the instant case the oldest charges appear to be the Molzen divorce action and the action of the respondent relating to the will of Lydia F. Evans. The divorce decree in the Molzen case was entered in 1951, 6 years before the hearing before the Committee on Inquiry. However, the decree of divorce in the Molzen action was modified in 1954. In the Evans will matter the action of the respondent upon which the charge was based was in September 1951. However, the matter was not closed, and the will was contested in the dis-

trict court and which on appeal to this court resulted in an opinion filed in December 1956.

The respondent complains that Lillian Bentley and Bert Bentley are now deceased. Hearings before the Committee on Inquiry on all the charges against the respondent were held in July and August 1957. Bert Bentley died April 6, 1958. The respondent had the opportunity to cross-examine Bert Bentley at the hearing before the Committee on Inquiry, and that evidence was before the referee pursuant to the stipulation of the parties herein. Lillian Bentley died on February 3, 1958. Dr. C. E. Wiltse died in 1958. The respondent, if he desired, could have taken the depositions of the latter two persons mentioned. This matter occurred in 1953.

We conclude that the respondent's defense of laches is without merit.

The respondent contends that he was denied due process of law under Article XIV of the Constitution of the United States and Article I, section 3, of the Constitution of the State of Nebraska. In this connection, the respondent asserts that certain members of the Committee on Inquiry were biased and prejudiced against him, and should have been disqualified from acting on such committee; that the Advisory Committee refused to review this matter; that an investigator, who was duly appointed, solicited complaints against the respondent by interviewing attorneys for that purpose; that the rules governing the hearing before the Committee on Inquiry and the Advisory Committee require secrecy of the proceedings and such rules were violated; and that the respondent made demand of the Committee on Inquiry for documents and papers in the possession of such committee, which the committee refused to produce at such hearing.

The rules creating, controlling, and regulating the Nebraska State Bar Association consist of eleven articles. Without setting forth the substance of each and

every article, suffice it is to say that a Committee on Inquiry is appointed by the Supreme Court in each district court judicial district of the state, and the Advisory Committee appointed by the Supreme Court consists of one member from each Supreme Court judicial district. From a reading of all the rules creating, controlling, and regulating the Nebraska State Bar Association, it is obvious and very apparent that the only function of the two committees, that is the Committee on Inquiry and the Advisory Committee, is to investigate charges against any attorney to determine whether there is proper cause to believe he has been guilty of unethical and unprofessional conduct and has violated the Canons of Professional Ethics.

Under the Revised Rules of the Supreme Court, Part III, Disciplinary Proceedings, Rule 2 provides: "Proceedings for discipline of attorneys may be instituted and prosecuted in the name of the State of Nebraska on the relation of the Nebraska State Bar Association, * * *."

Rule 3 provides: "Proceedings shall be initiated by the relator filing a verified complaint setting forth the grounds thereof with reasonable definiteness. The complaint shall be filed with the Clerk of the Supreme Court, who shall then docket the cause as an original proceeding in the Supreme Court."

Rule 4 provides in part: "Service upon the respondent may be had by serving upon him a copy of the complaint and notice of the time for answer in the same manner as service of summons is had in civil proceedings in the district courts of the state, * * *."

Rule 7 provides in part: "Upon the filing of an answer raising an issue of fact the court shall refer the matter to a member of the bar as referee. It shall be the duty of such referee to fix an early date for hearing, notify the relator and the respondent or their respective attorneys of record, and without delay to hear such testimony as may be introduced under the

pleadings. The referee shall have all powers of a referee in civil actions in the courts of Nebraska. The referee shall observe the rules of evidence applicable in civil actions in the district courts of the State of Nebraska. * * * The referee shall make a written report stating his findings of fact and recommendations. * * * and the referee shall promptly transmit to this court his report, together with such record so certified."

Rule 10 provides: "The court may disbar, suspend, censure or reprimand the respondent and take such other action as shall by the court be deemed appropriate."

It is noted that the rules of the Nebraska State Bar Association and the rules of the Supreme Court, as they relate to disciplinary matters, provide two separate and distinct procedures. The rules of the Nebraska State Bar Association provide for a judicial district Committee on Inquiry and a state Advisory Committee. The procedure therein set forth is primarily for the purpose of conducting an investigation, which investigation may be formal or informal. The purpose of this procedure is to make sure that no unwarranted complaints are filed against attorneys. By this means the charges against attorneys are investigated, and if sufficient facts appear to indicate that he might be guilty of a violation of a Canon of Professional Ethics, or might be subject to disciplinary action on the facts of each individual case, a complaint shall be lodged against him in the Supreme Court of the State of Nebraska.

In Chicago, B. & Q. R. R. Co. v. Headrick, 49 Neb. 286, 68 N. W. 489, this court said: "The term 'due process of law' has been often defined as such an exertion of the powers of government as are sanctioned by the settled maxims of the law and under such safeguards for the protection of individual rights as those safeguards prescribed for the class of cases to which the one in question belongs. (Cooley, Constitutional Limitations, 355.) * * * but is satisfied by a proceed-

ing applicable to the subject-matter and conformable to such general rules as affect all persons alike."

In Reed v. Reed, 70 Neb. 779, 98 N. W. 73, it is said: "Due process of law may be said to be satisfied whenever an opportunity is offered to invoke the equal protection of the law by judicial proceedings appropriate for the purpose and adequate to secure the end and object sought to be attained."

In Ripley v. Godden, 158 Neb. 246, 63 N. W. 2d 151, this court said: "The indispensable elements of due process are a tribunal with jurisdiction, notice of a hearing to the proper party, and an opportunity for a fair hearing according to applicable procedures."

In the instant case the relator has fully complied with these indispensable elements. A complaint was duly filed in the Supreme Court of this state; the respondent had full and complete notice of the same; he was given an opportunity to answer the complaint, which he did, at length; the issues were joined; a hearing was had, pursuant to the stipulation of the parties herein, before a referee duly appointed by this court; and evidence was heard on behalf of the relator and on behalf of the respondent. There can be no question, in the light of the decisions of this court, but that this court has jurisdiction to entertain disciplinary matters against lawyers admitted to the practice of law in this state.

It appears that the respondent primarily predicates denial of due process of law before the Committee on Inquiry and the Advisory Committee of the Nebraska State Bar Association. In the case of In re Sparrow, 338 Mo. 203, 90 S. W. 2d 401, it was pointed out that each state had complete control over the remedy which it offers to suitors in its court. The bar committees were clothed by rule with the power to make investigations and to hold formal hearings. Such investigations and hearings were found to be summary in character and not adversary in any proper sense but were intended to determine whether the facts were supported by credi-

ble evidence and whether or not such facts were sufficient to warrant the institution of a proceeding by information to discipline or disbar. The court said: "Subsequent subsections deal with the filing of information, issuance of summons, joinder of issue by answer, trial 'as in extraordinary legal remedies, always saving to each side a reasonable opportunity to present evidence and to be heard.' Thus the rights of confrontation of witnesses and due process of law are plainly and adequately safeguarded. It is plain also that the summary investigations and hearings provided for do not invade or impair any constitutional right of the person whose professional conduct is subjected to the preliminary enquiry."

As stated in the case of In re Conner, 357 Mo. 270, 207 S. W. 2d 492: "Procedure in disbarment is seldom uniform, varies widely with the state or Federal jurisdiction in which the action is pending and seldom follows any local code of civil procedure. Generally, the judicial department of the jurisdiction involved adopts and uses any procedure it deems appropriate to disbarment."

From our research, we have no doubt but that the matters relating to discipline, suspension, reprimand, or disbarment of attorneys practicing before the courts of each state are subject to the rules promulgated for that purpose. It is clear that the preliminary proceedings before the Committee on Inquiry and the Advisory Committee were merely investigating proceedings which neither end in any decree or establish any right. We conclude that the respondent was not denied due process of law in this case. The respondent's contention in such respect is without merit.

We have herein set forth certain of the charges against the respondent made by the relator in the complaint. We have carefully reviewed the record as it relates to all of the charges set forth in the complaint. The record shows that the respondent has failed to demonstrate loyalty and fidelity to his clients and to

meet the trust placed in him by them. In addition, in the practice of his profession he has not shown fairness and candor in his dealing with other lawyers, and has not dealt candidly with the facts in cases handled by him. It is also apparent from the record that the respondent has failed to uphold the honor and dignity of the legal profession.

The respondent has been actively engaged in the practice of law in this state for 28 years, with a rather large and extensive practice. Due to such practice, he should have been, and obviously was, well aware of the Canons of Professional Ethics which controlled his conduct while engaged in the practice of law. In view of the facts herein set forth, and all of the circumstances disclosed by the record relating thereto, we find that the ends of justice will be properly served by suspending the respondent from the further practice of law for a period of 1 year, the same to go into effect when our judgment rendered herein becomes effective. If, at the end of 1 year from the effective date of his suspension, respondent makes an affirmative showing sufficient to satisfy this court that he has fully complied with our order of suspension and that he will not, in the future, engage in any practices offensive to the legal profession then he will be reinstated and allowed to engage in the practice of law. In the event he fails to comply with the order as heretofore set forth, the suspension provided herein shall become permanent.

Judgment of suspension accordingly. All costs of this proceeding are taxed to the respondent.

JUDGMENT OF SUSPENSION.