STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION,
RELATOR, v. GEORGE G. RHODES, RESPONDENT.

453 N.W.2d 73

Filed March 23, 1990.   No. 89-142.

Dennis G. Carlson, Counsel for Discipline, for relator.

William M. Connolly, of Conway, Connolly and Pauley, P.C., for respondent.

HASTINGS, C.J., BOSLAUGH, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

This is a disciplinary proceeding against the respondent, George G. Rhodes, who was admitted to the practice of law in Nebraska on April 8, 1977.

Formal charges against the respondent were filed in this court on February 24, 1989. The respondent's answer was filed on March 13, 1989. The allegations in the formal charges center around the propriety of the respondent's conduct in prosecuting Daniel T. Speer and the respondent's behavior toward Bradley Roth, an attorney who was appointed special prosecutor for some of the Speer prosecutions.

The respondent was charged with having violated his oath of office as an attorney at law, as provided by Neb. Rev. Stat. § 7-104 (Reissue 1987), and the following provisions of the Code of Professional Responsibility:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

. . . .

DR 2-110 Withdrawal from Employment.

. . . .

(B) Mandatory withdrawal.

A lawyer representing a client . . . shall withdraw from employment . . . if:

. . . .

(2) He knows or it is obvious that his continued employment will result in violation of a Disciplinary Rule.

(3) His mental or physical condition renders it unreasonably difficult for him to carry out the employment effectively.

. . . .

DR 5-101 Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

. . . .

DR 5-105 Refusing to Accept or Continue Employment if the Interest of Another Client May Impair the Independent Professional Judgment of the Lawyer.

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of his client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105 (C).

. . . .

DR 7-102 Representing a Client Within the Bounds of the Law.

(A) In his representation of a client, a lawyer shall not:

(1) File a suit, assert a position, conduct a defense,

delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

In his answer, the respondent generally denied the substantive allegations contained in the formal charges. The respondent further alleged that this court does not have jurisdiction over this matter because the hearing panel of the Committee on Inquiry did not transmit formal charges to the Disciplinary Review Board within 45 days, as required by Neb. Ct. R. of Discipline 9(H)(3)(h) (rev. 1989). In this case, the respondent alleges the formal charges were transmitted 53 days after the committee hearing.

We held in *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989), that a lawyer is entitled to due process of law in a disciplinary proceeding. However, technicalities cannot be invoked to defeat charges where there is evidence showing that the conduct alleged against the attorney is ethically wrong. *State ex rel. Nebraska State Bar Assn. v. Jensen*, 171 Neb. 1, 105 N.W.2d 459 (1960), *cert. denied* 365 U.S. 870, 81 S. Ct. 905, 5 L. Ed. 2d 860 (1961); *State ex rel. Nebraska State Bar Assn. v. Leonard*, 212 Neb. 379, 322 N.W.2d 794 (1982).

Pursuant to Neb. Ct. R. of Discipline 10(B) (rev. 1989), this court may institute disciplinary proceedings on its own and has the inherent authority to direct the filing of disciplinary charges notwithstanding the action or inaction of the Committee on Inquiry. Even if formal charges are filed with the Disciplinary Review Board after the time provided in rule 9(H)(3)(h), the delay is not jurisdictional, and the rule does not require dismissal of the formal charges. We further note that the respondent has made no showing that he was prejudiced in any way by the alleged delay in the filing of the formal charges. The respondent's contention is without merit.

A referee was appointed on March 24, 1989, and the matter was heard on July 12 and 13, 1989. The report of the referee was filed in this court on August 15, 1989. The referee found that the respondent had violated the provisions of DR 1-102, DR 2-110, DR 5-101, and DR 7-102 and recommended that the respondent be suspended from the practice of law for a period

of 5 years. Exceptions to the referee's report were filed by the respondent on August 25, 1989.

## STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record, in which the Supreme Court reaches a conclusion independent of the findings of the referee, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987), *cert. denied* 488 U.S. 802, 109 S. Ct. 31, 102 L. Ed. 2d 10 (1988); *State ex rel. NSBA v. Kirshen, supra.* See, also, *State ex rel. NSBA v. Cohen*, 231 Neb. 405, 436 N.W.2d 202 (1989); *State ex rel. NSBA v. Neumeister, ante* p. 47, 449 N.W.2d 17 (1989). In its de novo review of the record in a disciplinary proceeding against an attorney, and to sustain a particular complaint against an attorney, the Supreme Court must find that the complaint has been established by clear and convincing evidence. *State ex rel. NSBA v. Douglas, supra*; *State ex rel. NSBA v. Kirshen, supra.* In a disciplinary proceeding against an attorney, the basic issues are whether discipline should be imposed and, if so, the type of discipline appropriate under the circumstances. *State ex rel. NSBA v. Douglas, supra*; *State ex rel. NSBA v. Kirshen, supra.*

## FACTS

The record shows that the respondent is the present Custer County Attorney. He was appointed to that office on August 5, 1980, and was elected in 1982 and 1986 to 4-year terms.

In the fall of 1985, Rhodes became personally acquainted with Daniel Speer. Speer was a 22-year-old Army veteran who was employed as a cook at the Tumbleweed Cafe in Broken Bow, Nebraska, where Rhodes ate meals nearly every day. Rhodes testified that he began leaving gifts for Dean Miller, another cafe employee, after the owner of the cafe, Donna Winbolt, told Rhodes that Miller was working his way through high school. A month or two later, Winbolt told Rhodes that Speer had applied for a job with the Omaha police department. Rhodes did not think Speer would get the job and began leaving

gifts for Speer in September or October 1985. These gifts included blue jeans, shirts, a cassette player, a leather jacket, cards, and concert tickets. Rhodes characterized the gifts as "basically charitable contributions" which were given to Speer on a seasonal basis.

Speer testified that in September or October 1985, he noticed that various gifts were being left in his car outside the Tumbleweed Cafe. Speer and Miller speculated that their benefactor was Rhodes. Speer testified that Miller stopped receiving gifts about a month after Speer started receiving them.

In late May and early June 1986, Speer was involved in two incidents of trespassing and vandalism at a drive-in theater near Broken Bow. A large "86" had been spray painted on the back of the theater screen. Rhodes received the police report of the incidents and spoke with Speer about his activities at the drive-in theater.

## The Criminal Mischief Complaint

In late June 1986, Rhodes and Speer met in Rhodes' office to discuss the damage to the drive-in theater. Speer testified that Rhodes talked to him at the cafe and asked Speer to come to the office. Speer went to Rhodes' office the next day. During their conversation, Rhodes said, "I'm sure by now you figured I'm the one that was leaving you the gifts."

Rhodes' recollection was that when he spoke with Speer about the drive-in theater incident, Speer "admitted it." Rhodes said he would file a charge and dismiss it at the end of the summer if Speer stayed out of trouble. According to Rhodes this was a standard practice of his. The record shows that Rhodes made the same agreement with the defendant in *State v. Chris Mills*. Rhodes also suggested that Speer think about going to college. During this conversation, Rhodes also asked Speer to go to a concert in Omaha with Rhodes and Mr. and Mrs. Carl Speer. Rhodes said he would pay for the trip.

Speer's version of the conversation was that Rhodes talked about being friends with Speer's older brother, Carl Speer, who was a police captain in Broken Bow. According to Speer, Rhodes said, "Well, your brother is running for sheriff and I am

helping him run, and too many people know about this deal up at the drive-in, so if I don't file charges against you it will look bad for your brother when the election comes around." Speer testified that Rhodes said he would forget "everything else that was involved in the deal" and would charge Speer with criminal mischief. Speer also stated that Rhodes told him to ask for a continuance when the hearing date came up, that Rhodes would ask for a continuance when it came up again, and that Rhodes would drop the charge after "it kind of fades out of everybody's mind." Speer claimed that Rhodes told him he would not need an attorney because the charge was going to be dropped.

On July 3, 1986, Rhodes filed a complaint for criminal mischief in the Custer County Court against Speer (docket 38, No. 684) for the incident at the drive-in theater which occurred June 4, 1986. Rhodes testified that although other individuals were involved in the incident, he filed the charge against Speer because Speer's car had been traced. Another factor Rhodes considered was that Speer was in his twenties and was an Army veteran; the other individuals were younger and included juveniles.

The court file in the case shows that two continuances were granted at the defendant's request, concurred in by the county attorney.

Rhodes testified that some time after the criminal mischief case was filed, Rhodes told Daniel Speer that he was making contributions to Carl Speer's sheriff's campaign. Rhodes testified that he contributed $4,700 to Carl Speer's campaign. Carl Speer's campaign budget totaled $5,000. Rhodes said that when the campaign was over, he would have some money available to help Daniel Speer with college expenses, and offered to pay Daniel Speer's expenses for a year or so. Rhodes stated that the criminal mischief case had been settled as between Rhodes and Speer, but acknowledged that the case was still pending on the court docket as part of that settlement.

In early July 1986, Rhodes spoke with Speer in Rhodes' office about a report of an assault, but Speer denied any wrongdoing. During this conversation, Rhodes offered to help Speer with college expenses and asked if Speer wanted to go on a trip to Omaha.

### The Omaha Trip

On July 26, 1986, Rhodes went to Omaha with Daniel Speer and Mr. and Mrs. Carl Speer to attend a concert. Rhodes drove his car and paid for the meals and the night's lodging for the entire party. Rhodes testified that he first asked Carl Speer and his wife to go to the concert, but later it occurred to him that Daniel Speer might want to go. Rhodes and Daniel Speer shared a hotel room.

Daniel Speer testified that the day after they arrived in Omaha, Rhodes talked to Speer about attending college and showed Speer his own college transcripts. Rhodes apparently denied showing Speer his transcripts. According to Speer, Rhodes discussed Speer's attending Kearney State College and said he would help Speer pay his college expenses and make Speer's car payments while he was in college.

Rhodes admitted that the Omaha trip occurred while the criminal mischief case was pending and that he paid for the lodging, tickets, and transportation. Rhodes also admitted asking Speer if he wanted to go to college.

On July 27, Rhodes asked Speer if he wanted to go to the world's fair in Vancouver, British Columbia. Rhodes offered to pay for the trip and said that the only money Speer would have to take was in case he wanted to buy souvenirs for himself or friends. On July 30, Speer came to Rhodes' office and said he wanted to go to Vancouver. Rhodes made the airline reservations on July 30 and purchased the fair tickets a couple weeks later. Rhodes testified that he and Speer planned their travel itinerary together.

### Sexual Assault Investigation

Approximately 1 week after the Omaha trip, Rhodes spoke to Speer about a sexual assault of a child. Rhodes testified that Deputy Sheriff Tom Mayo was investigating another individual, Ricky Ross, for first degree sexual assault of the victim. Mayo told Rhodes that the victim had sex with several others, including Speer. A police report dated July 26, 1986, indicates that Speer was having sex with an underage girl. Rhodes testified he mentioned this information to Speer because

the settlement [on the criminal mischief case] was that he would stay out of trouble; and also there was another incident where there was a police report that showed [Speer had] brought a girl home at 3:30 in the morning, and I was beginning to wonder what was going on with him.

Rhodes testified that he called Speer to the office to see if he would lie about the incident and that the purpose of the meeting was to warn Speer that Rhodes had been getting these reports and to explain the concept of statutory rape to Speer.

On August 8, 1986, Rhodes saw Speer at the Tumbleweed Cafe and asked Speer to come to the county attorney's office to discuss a new police report.

Rhodes testified that on August 22, 1986, he discussed with Speer a potential prosecution involving a sexual assault allegedly perpetrated by Ricky Ross on a minor. Rhodes explained that he showed Speer the police report because Rhodes heard that Speer had also done something like that. During the conversation, Rhodes told Speer he assumed the victim's sexual relations with Speer were consensual. Speer then admitted that he had sex with the minor child.

During the August 22 conversation, in an effort to impress upon Speer the seriousness of such cases, Rhodes asked Speer if he wanted to go to the Supreme Court to see a hearing where the husband was charged with first degree sexual assault. Rhodes also wanted to show Speer the University of Nebraska campus. Speer said he would like to go.

On September 5, 1986, Speer told Rhodes he had to work on September 11, the day Rhodes was planning to go to Lincoln, but would have some time off the following Wednesday and Thursday and would like to see the university then.

*The Lincoln Trip*

Rhodes and Speer drove to Lincoln on September 17, 1986. Rhodes testified that the purpose of the trip was for him to go to the law library and to show Speer the University of Nebraska campus. Rhodes paid the expenses of this trip, including transportation, meals, and two nights' lodging. Rhodes also bought school clothes for Speer, including shirts, pants, and

socks, which cost approximately $160. Rhodes testified that he offered to pay Speer's college expenses because although Speer was "not what you would call a nice person," he was Carl's brother, and Rhodes felt sorry for him working at the Tumbleweed.

Speer testified that during the Lincoln trip Rhodes said it would be better if they did not mention to anybody that they wĕre friends and going on trips because it could cause him (Rhodes) some problems. Rhodes denied telling Speer to keep their trips quiet. Speer said that Rhodes then showed him a newspaper article about an Omaha judge who got into trouble for fixing traffic tickets for his son-in-law. Rhodes testified (apparently regarding this conversation) that in the summer of 1986, he had a conversation with Speer about a judge who had gotten into trouble for trying to help his son. The purpose of the conversation was to tell Speer that he could not rely on the fact that his brother was a police captain to keep him out of trouble.

At his September 23, 1986, arraignment in the criminal mischief case, Speer appeared pro se, pled not guilty, and waived his right to counsel. Rhodes appeared as county attorney. Speer testified before the referee that he kept expecting Rhodes to postpone the hearing date, "and it was getting to the point that I was thinking . . . he's made the whole thing up so that I wouldn't get an attorney." Rhodes explained to Speer that the hearing was just to set a trial date and told Speer that all he had to do when the judge asked for a plea was say "not guilty." Then Rhodes said Speer could postpone the trial until the charge was dismissed. Speer testified that on September 23 Rhodes "vaguely hinted" at dismissing the charge.

Rhodes' testimony indicates that he told Speer to "just go up and ask the court for" a postponement. Rhodes denied discussing a scheme or plan on how to get the case continued, stating that he merely told Speer that he could ask for a continuance if the case came up before the summer ended and that he would agree to a continuance.

Rhodes and Speer left for Vancouver the following day. The record shows that the criminal mischief case against Speer was dismissed that day (September 24) because the plaintiff

"show[ed] the Court that the confession obtained from the defendant is not admissible as evidence for the reason same was induced by a promise." Rhodes testified before the referee that the case was dismissed because the arresting officer had made a promise and certain statements could have been suppressed. The police report attached to the State's motion for dismissal does state: "Suspect Speer upon learning of no charges did fully admit his part in the incident and the painting [of the drive-in theater]." Rhodes also reiterated that his original agreement with Speer was that the case would be dismissed if Speer stayed out of trouble for the summer.

*The Vancouver Trip*

On September 24, Rhodes and Speer flew from Omaha to Seattle, spent the night in Seattle, and drove a rental car to Vancouver. They rented a hotel room, spent two nights in Vancouver, and attended the world's fair. Speer testified that during the second night in Vancouver,

> Mr. Rhodes kept sliding in bed up next to me, and I'd move away from him. I didn't think anything about it as long as I could keep moving away from him. Then he slid up next to me and he put his arm around me. So I got up and I told him, I think the way I put it was "I'm not like that, and if you don't stay away from me I'll kick your ass." And Mr. Rhodes said, "But I thought you understood I loved you."

Speer testified that he then slept on the couch or a chair in the hotel room. Rhodes vehemently denies this incident.

Speer testified that during the Vancouver trip, he and Rhodes again discussed the alleged sexual assault of the minor child by Ricky Ross.

The record contains Rhodes' letter of September 24, 1986, informing Speer that the criminal mischief charge had been dismissed. The letter is on Rhodes' business letterhead and states only that "I have enclosed herewith, your formal notice that I have dismissed the above-referenced case." A "nolle prosequi" dated September 24, 1986, was enclosed with the letter. Rhodes testified that he gave the letter and nolle prosequi to Speer on September 24 when he picked Speer up at Speer's

house to go to Vancouver. Speer testified that Rhodes delivered the documents to him in Vancouver, saying, "I was saving this for a special occasion, but you might as well have this now." Speer stated that Rhodes then invited him on a trip to the Bahamas.

Speer and Rhodes returned from Vancouver on September 29, 1986, via Omaha. Speer claims to have been surprised and upset at the prospect of spending the night in Omaha with Rhodes. Rhodes says that he and Speer planned the trip together and that Speer planned all along to spend the night in Omaha. Rhodes testified that on the way between Omaha and Broken Bow, Speer invited Rhodes to attend the Oklahoma-Nebraska football game. Rhodes accepted and invited Speer to go with him to a law enforcement seminar or investigator's school if Rhodes did not have a trial scheduled for the day of the seminar. The record contains a tape recording of Rhodes' subsequent telephone conversation with Speer after returning from Vancouver indicating that the *Haumont* jury trial was off and that Rhodes could go to the seminar. Rhodes recalled that he also discussed Ricky Ross' preliminary hearing with Speer during the drive from Omaha to Broken Bow and that Speer admitted sexual penetration with the victim in the Ross case.

### Conflict Develops Between Rhodes and Speer

Speer testified that after returning from Vancouver, their relationship changed in that Speer now tried to avoid Rhodes. Speer said he talked to Rhodes as little as possible, but that Rhodes made telephone calls to him after the Vancouver trip. Speer believed that Rhodes "kind of had me over a barrel" in that Speer was worried the criminal mischief charge would be refiled.

Around the time he and Speer returned from Vancouver, Rhodes discovered that Speer had been "secretly going out late at night" with a girl who was in grade school. Rhodes also had received information that Speer had been window peeping and had sexually assaulted several other girls. Rhodes did not have any written reports regarding two of them, but the record shows that Bradley Roth, special prosecutor, subpoenaed them in the

sexual assault case filed against Speer. Rhodes explained that Deputy Mayo had been investigating Ricky Ross in connection with a sexual assault and had talked about the victim's having had sex with a number of men, including Daniel Speer. After returning from Vancouver, Rhodes heard that Speer had been investigated by the Ansley marshal for sexually assaulting a grade school girl. Rhodes referred the latter investigation to the Custer County sheriff's office at the end of the first week in October.

Rhodes testified that Speer did not act angry with him until a week after they returned from Vancouver. He acknowledged that Speer seemed to be avoiding him, but Rhodes did not know why. When Rhodes asked Speer what was going on, Speer walked away. Rhodes then wrote Speer several notes and sent him a Mailgram asking what was going on. The notes were left in Speer's car while Speer was at work.

Exhibit 10 contains a greeting card and four letters. Exhibit 11 is a final draft of the last letter in exhibit 10. In the first letter, Rhodes refers to his hope that Speer would go to college and to the "happy times" they had together in Omaha, Lincoln, Seattle, and Vancouver. In the second letter, Rhodes refers to enclosing a shirt as a souvenir "to remember some of the fun trips that we took." Rhodes then invited Speer to go to a Billy Joel concert—"Then of course after the trip you could always go back to being mad at me if you wanted to." Rhodes' third letter refers to enclosing a book covering "the top professional law enforcement agencies such as the FBI" and states that Rhodes had a line on a job opening up if Speer decided against going to college. The fourth letter, exhibit 11, recalls "the events which occurred on the day that you stopped speaking to me," including Ricky Ross' preliminary hearing, Rhodes' leaving a Halloween card in Speer's car, and Rhodes' discussing the Vancouver trip with Donna Winbolt and Speer's mother. The letter also states:

> When I received a police report from your brother which stated that on a certain night you had been out with Misty Parker and that she had been beaten up, I did not simply jump to the conclusion that you had assualted [sic] her and file an assualt [sic] charge, but instead, I gave you an

opportunity to explain and you had a simple explaination [sic] which cleared up the matter.

Rhodes testified that on or about October 3, he encountered Speer at the Tumbleweed Cafe. On that occasion, Rhodes observed that Speer had an "intense glare" on his face and glared at Rhodes while Rhodes ate. On another occasion in the cafe, Rhodes tried to talk to Speer, but Speer ran from the room. Rhodes concluded that Speer was upset because Rhodes had reported him to the sheriff's office in conjunction with the sexual assault investigations.

*The Burglary Charge*

In late November 1986, Rhodes received a police report regarding two of the sexual assault victims. On November 26, Rhodes filed a burglary charge against Speer in connection with a May 30, 1986, incident at the drive-in theater. Rhodes testified that the basis of the charge was breaking and entering the drive-in theater with the intent to commit a felony. The charge was based on the same police report which led to the earlier criminal mischief charge against Speer. The police report involves two separate incidents which occurred 5 days apart. Rhodes testified that he did not receive additional police reports about the incidents at the drive-in theater, but had done more legal research which would help him develop evidence regarding breaking and entering. Rhodes stated that after he realized Speer was a child molester, he felt that "something had to be done to get him corrected." After doing research, Rhodes realized he could offer immunity to a potential codefendant, Dusty Parker, and decided to file a burglary charge.

The burglary complaint was dismissed without prejudice on January 13, 1987. Rhodes testified that he dismissed the burglary complaint because Parker was in the military and was unavailable to testify.

Rhodes had filed charges for criminal mischief and trespass against Dusty Parker on December 29, 1986, for an incident which occurred May 21, 1986, at the drive-in theater. Rhodes testified that he filed charges against Parker after Parker boasted about having gotten away with it. Steven Stumpff was appointed special prosecutor in that case on May 16, 1988, and

dismissed the charges without prejudice on that date because Parker was in the Air Force and was a military policeman. Stumpff stated that no property was destroyed on the night Parker was at the drive-in theater and that he believed Parker had grown up.

### The Felony Charges

In early December 1986, a Deputy Sanchez delivered to Rhodes the written statement of Jerod Beck, a 16-year-old, about an incident involving Speer. In his statement, Beck reported that on the night of February 28, 1986, Speer forced Beck to the ground with a 3-foot stick, threatened to dislocate Beck's shoulder, and forced Beck to accompany Speer in Speer's automobile. Rhodes' exhibits indicate that in late December, he discovered that Jerod Beck's brother, Aron Beck, intended to sue the city for an alleged civil rights violation. The basis of the suit was that Aron Beck had been detained outside the city limits by the Broken Bow police for driving while intoxicated. Aron Beck claimed he was denied equal protection of the law because no action was taken on the assault committed on Jerod by the police captain's (Carl Speer's) brother inside the city limits. Rhodes then offered to prosecute Speer for the attack on Jerod Beck rather than to prosecute Aron Beck for driving while intoxicated.

On January 12, 1987, Rhodes filed felony kidnapping and false imprisonment charges against Speer for the Jerod Beck incident. Speer testified that he was arrested and spent the night in jail. Speer appeared pro se at his bond hearing in county court the next morning. Rhodes requested that Speer be allowed a signature bond. The county judge, however, required Speer to post 10 percent of a $3,000 bond.

### Speer Threatens Rhodes

Rhodes testified that Speer began threatening him in January 1987 and that Rhodes began carrying a pistol around the time the felony charges were filed. Rhodes also noted that Speer had been caught with weapons after making some of the threats. Until that time, Speer had not physically threatened Rhodes. Speer admitted that he threatened Rhodes in Vancouver, but stated that he made no other threats against

Rhodes.

Rhodes continued to frequent the Tumbleweed Cafe. Speer testified that at some point in time he became aware that Rhodes was carrying a pistol in the cafe. Speer stated that Rhodes would come into the cafe wearing a three-piece suit, stand within Speer's sight, take his jacket off, and adjust his holster. Rhodes admitted taking his pistol to the cafe. Speer also complained that Rhodes began to follow him in his automobile. Rhodes denies following Speer.

On January 23, Speer threatened to assault Rhodes, prompting Rhodes to withdraw from the Speer prosecutions.

Rhodes testified that on the Thursday preceding January 26, 1987, Speer had been following Rhodes in his car "very close." On Friday, when Rhodes was at the Tumbleweed, Speer told another cook that Rhodes looked like a fag. When Rhodes returned to the cafe later in the day, Speer pointed at him and said, "Look at him, I really had him on the run last night. Next time I'm going to beat his ass; I don't care; I'll get probation anyway; that's nothing, I've been on probation to [Probation Officer] Kawata before." Speer also said, "I'm really going to get even."

*Appointment of Special Prosecutor*

Rhodes approached attorney Bradley Roth on January 25, 1987, and informed Roth that he had been threatened by Speer and was going to withdraw as county attorney in the Speer prosecutions. Rhodes wanted Roth to be appointed special prosecutor in the cases. Roth testified that during this conversation, Rhodes did not indicate he had a personal relationship with Speer, but that Rhodes' fear of Speer appeared to be real.

Roth was appointed special prosecutor on January 26, 1987. Roth and Rhodes discussed the charges pending against Speer, other potential charges, and whether the charges should be plea bargained. Roth testified that Rhodes said that "I [Roth] would have no respect for him [Rhodes] if I reduced the felony charges to something lower." Rhodes then explained in detail some efforts he made to help Speer. Rhodes did acknowledge that it was within Roth's discretion to dispose of the charges filed

against Speer.

Roth dismissed the kidnapping charge without prejudice on January 27. Roth agreed that the kidnapping charge (which had been filed by Rhodes) was technically correct but felt that, being inexperienced, he might not have been able to get a conviction. Speer's attorney, Kent Schroeder, informed Roth that Speer would be willing to plead guilty to a Class I misdemeanor at the preliminary hearing on the false imprisonment charge. Roth apparently rejected this offer, and Speer was bound over to district court on the charge of first degree false imprisonment. On January 30, 1987, Roth filed an information in district court charging Speer with the first degree false imprisonment of Jerod Beck and attempt to deliver alcohol to a minor. Speer's plea in abatement was overruled on May 1, 1987.

On February 17, 1987, Roth filed a complaint charging Speer with first degree sexual assault of a child and corresponded with Rhodes about the charge. In his letter, Roth indicated he had subpoenaed two girls who were the subjects of the sheriff's investigation and asked Rhodes to "please let me know if you can think of any other witnesses I should be subpoenaing." Rhodes advised Roth that there was not enough evidence to get a conviction. After a jury trial, Speer was acquitted on this charge. Rhodes argues that Speer's acquittal "shows that I was still able to assess the cases fairly well."

Roth noticed that shortly after he was appointed special prosecutor, Rhodes began keeping weapons in his office and appeared to be genuinely afraid of Speer. Speer testified that he (Speer) owned an assortment of firearms, including a 20 gauge shotgun, a .35 Remington rifle, a .22 revolver, and possibly a .357 Magnum revolver.

On February 27, 1987, Speer attempted to buy a pistol at Gibson's Discount Center. William Linder, a clerk at Gibson's who waited on Speer, testified that Speer purchased a semiautomatic pistol with a 6-inch barrel and falsified a federal form in order to purchase the gun by stating that he was not currently charged with a felony. Linder called the police department after being advised by a coworker that felony charges were pending against Speer. The gun was then returned

to the store approximately 15 to 30 minutes after Speer purchased it.

Rhodes testified that Speer tried to purchase this weapon after threatening Rhodes. Rhodes became aware of the purchase after receiving a call from the police department about Speer's false statement to purchase a firearm. Rhodes referred the matter to Roth, but did not notify federal authorities of Speer's gun purchase. Nevertheless, Rhodes felt that Speer was dangerous because "he was pulling all these things and getting away with them." Convinced that Speer was trying to kill him, Rhodes went to Gibson's and purchased the gun himself.

Rhodes testified that on March 9, 1987, Speer threatened to slit his throat. On April 17, 1987, Rhodes saw Speer purchase 500 rounds of regular .22 ammunition and 100 rounds of hollow point ammunition at Gibson's. Cindy Cole, a clerk at Gibson's, testified that Speer was alone and paid for the ammunition in cash. Rhodes was alarmed because this ammunition would fit the gun that had been taken away from Speer. Rhodes reported the purchase to the sheriff's office. He testified to an incident at the Tumbleweed where Speer pointed at Rhodes with his hand formed like a gun. A written exhibit offered by Rhodes states that in April 1987, "Speer threaten[ed] to blow my head off with [a] firearm." At this time, the false imprisonment and sexual assault charges were pending against Speer, with Roth as special prosecutor.

### Rhodes' Behavior Toward Special Prosecutor

In April or May 1987, Roth told Rhodes that he was considering reducing the false imprisonment charge against Speer to two Class I misdemeanors. Roth testified that Rhodes was not pleased and did not think it was a proper plea bargain. On May 21, 1987, Roth filed an amended information charging Speer with third degree assault. Pursuant to a plea agreement, Speer pled guilty to third degree assault, and the false imprisonment charge was dropped.

After Speer entered his guilty plea, he prepared a typewritten statement regarding the incident. Beginning at page 4 of his statement, Speer discusses the gifts given to him by Rhodes, the

Omaha trip, Rhodes' offers to pay Speer's college expenses, and the incident in Vancouver. Speer stated at page 6 that he was charged with kidnapping and false imprisonment because Rhodes "was using this incident to gain revenge against me for turning down his advances towards me."

Roth testified that after the plea agreement, his professional relationship with Rhodes became strained. Rhodes barely spoke to Roth after Speer's plea was accepted. For example, Rhodes began sending everyday correspondence to Roth by certified mail, made many objections to Roth's motions and discovery requests, would not give Roth access to police reports, and indicated there would be no more plea bargains on felony cases. The policy on plea bargaining extended to other attorneys besides Roth. Rhodes also began objecting to Roth's fees as a court-appointed attorney. Rhodes believed that Roth was charging the county excessive fees and was using work product which he was gaining as an attorney for the State and using it against the State.

Rhodes remained frightened of Speer. One day in June 1987, Rhodes observed Speer at the cafe in a "shaking rage." That evening, Rhodes wore a shoulder holster to the cafe and heard Speer yelling in the kitchen. Rhodes' food was late, so he put his feet up and read a newspaper. Speer appeared and told Rhodes to put his feet down. When Rhodes paid for his meal, he took his jacket off so Speer could see the holster. Rhodes testified, "I thought if he realized I was armed, he would be less likely to go ahead with an attack." Speer called the police. An officer came and spoke to Speer, but not to Rhodes.

*The Rattlesnake Incident*

Rhodes reports that he was threatened by Speer on August 12, 1987. The following day, Rhodes traveled to Lincoln to meet with an assistant attorney general about a complaint by Speer against Rhodes. When Rhodes returned from Lincoln, he was informed by Deputy Mayo that a rattlesnake had been confiscated from Speer. Rhodes noted that Speer had a set of Rhodes' car keys which he had obtained during the Omaha trip and that a week or 10 days prior to the rattlesnake incident, Rhodes discovered a mouse in the trunk of his car. Rhodes

believed that Speer intended to kill him with the rattlesnake.

Speer testified that he captured the rattlesnake at his girlfriend's house and kept it in an aquarium in his bedroom and that he did not even have the snake for a full day. Speer's mother found the snake and told Carl Speer to take it away. Carl called and asked Daniel Speer if he wanted the snake. Daniel Speer said he did not. Carl Speer then killed the snake. They cooked it and ate it. Daniel Speer stated that he did not intend to use the rattlesnake to kill Rhodes.

### Deposition of Cindy Ash, September 16, 1987

The record shows that Rhodes and Roth deposed Cindy Ash in the case of *State v. Coleman*. Roth represented the defendant, Pete Coleman, also known as Rufus Two Two. During the deposition, Roth observed a 12-inch bayonet on the table with Rhodes' materials. The bayonet was covered with a sheath. Roth did not recall whether Rhodes handled the bayonet during the deposition, but testified that the bayonet was not marked as an exhibit or used in the deposition. Roth testified on cross-examination that he was not threatened or intimidated when he saw the bayonet.

David Francis, the court reporter who recorded the Ash deposition, testified that he noticed a large knife on the counsel table in the courtroom. Francis testified that when Roth entered the courtroom and asked Rhodes what the knife was for, Rhodes replied, "That's for you in case you make me mad." Francis characterized Rhodes' statement as an attempted joke. Francis further testified that Rhodes handled the knife during the deposition, holding it with the blade pointed up, and that he (Francis) became apprehensive when he realized the knife had nothing to do with the deposition.

Rhodes testified that he had a collection of antique Swedish military equipment, that he had brought the bayonet from home to put in his office, and that the bayonet was in the courtroom because he went from home directly to the courtroom. He recalled looking at the knife before the deposition, but did not recall looking at it during the deposition. Rhodes remembered Francis' commenting on the bayonet when Rhodes was looking at it while waiting for Roth.

Francis asked what the bayonet was for. As a joke, Rhodes said, "Well, it's for Brad." Rhodes eventually gave the bayonet to Carl Speer as a gift. Rhodes admitted the bayonet had nothing to do with the deposition. He thought that since he and Roth had been "going around" on Roth's claims with the county, it was a joke that Rhodes would give Roth a gift, considering the fees Roth was charging.

*Deposition of Daniel Speer, September 16, 1987*

The record shows that Rhodes was the prosecuting attorney in *State v. Larry L. Rush*, in the district court for Custer County. Rush was charged with possession of a burglar's tool, "criminal attempt," and criminal mischief. The defendant moved to depose Speer and others pursuant to Neb. Rev. Stat. § 29-1917 (Reissue 1985). Rhodes also moved to depose Speer because Speer had been twice imprisoned with the defendant and was "believed to be in possession of incriminating admissions" made by Rush. On September 3, 1987, the district court granted both parties' motions to depose Speer in the Rush prosecution.

The Speer deposition was taken on the afternoon of September 16 in the district courtroom in Broken Bow. At Rhodes' request, Francis and his assistant recorded this deposition on videotape. Rhodes requested that he not appear on the videotape. Francis testified that such a request was not unusual. At defense counsel's request, however, Francis' assistant turned the video camera to show Rhodes' demeanor in the courtroom. Rhodes testified that he had the deposition videotaped to deter "something" and sat at the judge's bench during the deposition because he thought Speer might pull a weapon. Rhodes also took the nameplate from his office and put it on the judge's bench. Rhodes did not believe it would help to have a sheriff in the courtroom or that there were legal grounds to have Speer searched.

Francis observed that Rhodes had changed from a light-colored summer suit and appeared that afternoon wearing dark blue trousers with a yellow stripe down each leg. Rhodes' coat was like a uniform coat, and he was wearing a white shirt and black tie. The coat had a badge on the left breast pocket and

a medal on the right. Rhodes also was wearing a gun with a long barrel. The gun originally was in a holster sitting on a chair in the courtroom. Francis testified that Rhodes later strapped the holster around his waist. Rhodes did not recall putting on the gun and holster in the courtroom. When Francis asked Rhodes what he was doing, Rhodes said that there was a court rule that any officer who wore a firearm in the courtroom must be in uniform. The weapon was a "686 Smith and Wesson stainless steel" and was loaded.

Rhodes admitted that he wore a law enforcement uniform to the deposition. He had purchased the uniform from a catalog and claims he was entitled to wear a uniform because, pursuant to the statutes, he is a coroner with the duties of a peace officer. Rhodes testified that he did not order the uniform specifically for the Speer deposition. He believed that Speer had mental problems and that Speer would try to get even with Rhodes.

Rhodes testified that he began to carry a small pocket pistol after being threatened by Speer and that Speer's deposition was originally scheduled to be held in the board of supervisors' room, where Rhodes could carry his pocket pistol. Rhodes once again noted that Speer had threatened his life several times, had been caught with weapons, and had been in the military police. Rhodes explained that he thought Speer might think twice about killing a law enforcement officer as opposed to a regular person and ordered the uniform thinking that on Halloween he would go out in uniform and make an impression on Speer that "this is a peace officer you're trying to kill." Rhodes did wear the uniform and badge on Halloween.

At this time, Rhodes usually carried a firearm because of Speer's threats. Rhodes stated that the rule of the district court was that only uniformed officers could wear sidearms in the courtroom. He decided on the spur of the moment to wear the uniform to the deposition so he would comply with the court rule regarding sidearms. The uniform arrived by United Parcel Service the same day as the Speer deposition and was delivered to the courthouse after lunch. Rhodes changed into the uniform in his office and put on a badge that had been given to him by law enforcement officers. He also wore a "mock trial group" medal.

During the deposition, Rhodes began questioning Speer about how he and Rhodes had met. Rush's attorney objected to the line of questioning on the grounds of relevancy, but Rhodes claimed the questions were foundational to show that Speer was a hostile witness. Rhodes explained to the referee that he was trying to talk Speer out of his anger and get him to cooperate at the deposition.

The record of the deposition contains approximately 40 pages of testimony elicited by Rhodes on topics including the drive-in theater incident, why Speer never went to college, the Omaha concert trip, the trip to Vancouver, conversations at the Tumbleweed Cafe, conversations regarding a sexual assault victim and Ricky Ross, the trip to Lincoln, alleged homosexual advances made by Rhodes, Rhodes' attempts to talk to Speer after the Vancouver trip, one of the sexual assault incidents, the Jerod Beck kidnapping/false imprisonment incident, the criminal charges filed by Rhodes against Speer, issues of constitutional law with respect to civil rights actions, the disposition of charges against Speer by Roth, Speer's purchase of a gun at Gibson's, and Speer's visits to a psychiatrist. Rhodes then stated to Speer during the deposition that "maybe he [Rhodes] is trying to make a point that he [Rhodes] wasn't out to lock you [Speer] up forever."

Only approximately two pages of the deposition testimony are devoted to Rhodes' questioning Speer about statements made by the defendant, Larry Rush, in the jail.

Speer testified that he appeared pro se at the deposition, but that Rush's attorney, Gary Washburn, told him not to talk to Rhodes until Washburn was present. Speer described Rhodes' attire as a blue "sports jacket" with a badge and medal and testified that Rhodes was carrying a weapon. Speer stated that he was not frightened, but was embarrassed by Rhodes' questions about their personal relationship.

Rhodes now admits the deposition in the Rush case probably was not a very good idea. He stated before the referee that he would not be dressing up in any uniforms in the future and that he only wore the uniform because he was afraid of Speer. Rush's attorney, Gary Washburn, testified at the referee's hearing that Rhodes' manner was very calm during the Speer deposition and

that the only loud or boisterous language came from Speer.

*Discovery Dispute With Roth*

On September 18, 1987, Roth and Rhodes were to exchange discovery items in the district courtroom pursuant to a reciprocal discovery order entered in *State v. Hunsaker*. Roth testified that when he arrived at 1 p.m., Rhodes was already in the courtroom, sitting in the front jury seat. Rhodes was wearing a suit, his coat was buttoned, and he was staring straight ahead with a "glazed" look on his face. Prior to this occasion, Roth had seen Rhodes carrying a pistol "on his side" and in a shoulder holster. Roth was concerned that Rhodes was carrying a gun. Roth asked Rhodes if he had any of the discovery materials. Rhodes pointed at items sitting on the ledge in front of him. As Roth walked over to the jury box, Rhodes pushed the items over the ledge so that two documents fell on the floor. The items consisted of a telephone directory, a letter from Rhodes, and the bill of exceptions from Hunsaker's preliminary hearing. There were no police reports. Rhodes gave Roth the telephone book so that Roth could look up the witnesses' addresses himself.

Roth testified that the judge had specifically ordered that the police reports be provided. After Roth asked for the police reports, Rhodes responded very sternly, "I'm not giving you the police reports until I get your witness list." Roth said it was his understanding that he did not request a witness list from Rhodes, so Roth did not have to provide a witness list.

Rhodes continued to refuse to provide the police reports. When Roth asked if he had anything else, Rhodes appeared to lose control. Roth testified that Rhodes "came up over the jury box very rapidly with his arms waving and made a loud noise, coming directly at me. . . . He made a loud, 'Gerr-rr-rr.' " Roth was stunned and took off and ran around the counsel table. Rhodes did not follow him, but headed toward the back of the courtroom, turned around, and said, "You chicken shit." Rhodes denies calling Roth a chicken shit. There were no other witnesses to this incident. Roth testified that he was "extremely scared" and that he left the courtroom to discuss the incident with Jeff Kawata, a probation officer. Roth returned to his

office and prepared a memo for his file about the incident.

Rhodes testified that there was a reciprocal discovery order in the *Hunsaker* case and that he and Roth had a disagreement about the defendant's witness list and the police reports. Rhodes said he became exasperated and said, "This is chicken shit." Rhodes denied sitting in the jury box and jumping over the jury box. Roth's partner was eventually ordered to give the State a witness list in the case.

Roth testified that he was concerned for his own personal safety from the time he reduced the felony charges against Speer until this incident in the courtroom. Roth and his family began to lock all their doors at home. Roth stopped working in his office at night and made sure that discovery exchanges were made in the presence of a judge. Roth stated that he considered leaving Broken Bow as the result of Rhodes' conduct.

*Further Contacts With Speer*

Speer continued to threaten Rhodes during the fall of 1987. During Christmas 1987, however, Rhodes gave Speer a leather jacket, several magazine subscriptions, a shirt, a movie, a book, cologne, and $50 cash. Speer estimated the value of these gifts to be $600. Rhodes gave the gifts to Carl Speer, who forwarded them to Daniel Speer. Daniel Speer never returned any of Rhodes' gifts. Rhodes also bought Carl Speer a "Colt 45 Officers Model" that cost $455. Rhodes thought that if he got Daniel Speer a Christmas present, Speer would settle down and quit trying to kill him.

On January 7, 1988, Rhodes signed up for Tae Kwon Do classes after finding out that Daniel Speer had enrolled. Rhodes did not want Speer to "get the upper hand on me, become physically superior to where he could destroy me hand-to-hand." Carl Speer and Deputy Mayo also took the classes. Rhodes continued the classes even after Daniel Speer dropped out.

In April 1988, about 1 week before Daniel Speer's birthday, Speer threatened Rhodes after Tae Kwon Do class. Speer said he was "good with a gun, with an M-16, and good with a 45." Speer threatened to shoot Rhodes and stated that when he did, it would be a kidney shot so that Rhodes would really suffer.

Rhodes testified that by this time he was not afraid of Speer anymore and decided to buy him a birthday card.

On April 14, Rhodes gave Speer a birthday card containing $50. The card depicted a cartoon character holding a can of spray paint and reminded Rhodes of what Speer had done at the drive-in theater. Rhodes said he sent the card as a way of saying, "You can't get my goat any more; I'm not afraid of you, you vandal."

### Credibility of Daniel Speer

The referee concluded that "[t]here is no question but that Daniel Speer, the principal witness against Mr. Rhodes, falsified parts of his testimony and that he was impeached numerous times on cross examination by Mr. Rhodes' counsel and by the witnesses called for the purposes of impeachment."

Thomas Zimmer, a conservation officer with the Game and Parks Commission, testified that he checked Daniel Speer for a hunting license in the fall of 1984. At that time, the law required that anyone 16 years of age or older had to have a hunting license. Speer lied to Zimmer about his age, indicating that he was only 16, but then produced a driver's license that confirmed he was 21. Speer denied lying to Zimmer.

Michele Taylor, who was 18 years old, testified that on May 23, 1989, she was sunbathing on the riverbank in Pressley Park with her friend, Cathy Russell. Taylor and Russell saw Speer standing on the other side of the river. The two women then saw Speer drop his swimming suit or underwear and begin "fondling himself." Taylor testified that she did not report the incident to law enforcement because she did not want to go to court and "didn't want all the problems it would cause." Taylor further stated that she was afraid of Speer and did not want to testify against him.

Speer's testimony on cross-examination suggests the possibility that Speer is homophobic and that he was not truthful in his testimony regarding his purchases of a gun and ammunition at Gibson's, the 1984 hunting incident, the Jerod Beck assault, and the incident in Pressley Park. Speer "quit" his job at the Tumbleweed Cafe after assaulting another employee. He was fired from a job at Becton-Dickinson in Broken Bow

for lying on a timecard.

The referee found that Speer's testimony relating to the material parts of the case was corroborated by the circumstantial evidence and the reasonable inferences to be drawn from the known facts and the admissions of the respondent, Rhodes. The record supports this finding.

In summary, the evidence shows that sometime during late 1985 and early 1986, Rhodes started to develop a relationship with Daniel Speer. It began by Rhodes' presenting Speer with expensive gifts, contributing $4,700 to Carl Speer's campaign, offering to pay at least an equivalent amount for Daniel Speer's college expenses following the campaign, and offering to make Daniel Speer's car payments while he was in college. Rhodes also took Speer on trips to Omaha, Lincoln, and Vancouver, all of which Rhodes paid for. Rhodes also discussed with Speer the possibility of trips to Missouri and the Bahamas. All of the essential facts are admitted by Rhodes, although he attempted to explain them away as acts of charity. The expenditures Rhodes made during a relatively short period of time demonstrate a consistent and aggressive effort on the part of Rhodes to develop his relationship with Speer.

While Rhodes was fostering his relationship with Speer, Rhodes was also prosecuting Speer and had filed a misdemeanor criminal mischief charge against Speer in the county court for Custer County. During the various trips they took together, Rhodes discussed cases with Speer involving sexual matters involving not only Speer but also other individuals who were involved with girls in Broken Bow who were under the age of consent. The relationship between Speer and Rhodes was not the type of relationship between a prosecutor and defendant that can be tolerated in a criminal case.

Rhodes manipulated the criminal justice system against Speer, in violation of DR 7-102, while providing gifts in an effort to establish a relationship with Speer. The effort went from attempting to ingratiate himself with Speer by dismissing relatively minor charges to attempting to coerce and intimidate Speer by filing more serious charges. The conduct of the respondent after the Vancouver trip was erratic at best. Rhodes

started writing notes and letters to Speer in an effort to get Speer to talk to him, when it was clear that Speer wanted nothing to do with Rhodes. Rhodes' testimony that his motive toward Speer was charitable because Rhodes was in the habit of helping people is not convincing in view of the record and the lack of substantial evidence of any real effort by Rhodes to help anyone, except Daniel Speer and his brother Carl.

Rhodes' testimony that he was afraid of Speer did not justify Rhodes' conduct. Speer's threats may have been related to what occurred in Vancouver, rather than originating from any prosecutorial action against Speer. There is no adequate explanation why respondent did not prosecute Speer for any of the alleged threats that he made against Rhodes or for the failure to prosecute Speer for other offenses by Speer which Rhodes knew about.

Rhodes' conduct toward the special prosecutor, Roth, and Rhodes' conduct during the deposition was erratic and bizarre. The problems between Roth and Rhodes started only after Roth became active in the Speer prosecutions. Instead of completely withdrawing from those cases, Rhodes attempted to exert some influence upon Roth.

The evidence shows clearly and convincingly that Rhodes was guilty of misconduct and that he violated the provisions of DR 1-102, DR 2-110, DR 5-101, and DR 7-102.

Rhodes argues that a prosecutor is disqualified only when he is the victim in a case which he prosecutes. This argument lacks merit, and, as the relator points out, such a rule would permit prosecutors to prosecute their close friends and relatives.

In *Kennedy v. L.D.*, 430 N.W.2d 833, 837 (Minn. 1988), the Supreme Court of Minnesota stated, "It is improper for prosecutors to participate in cases which involve personal friends or relatives . . . ." See, also, *State v. Bell*, 84 Idaho 153, 370 P.2d 508 (1962), in which the court held that an affidavit of the prosecuting attorney alleging that the defendant and prosecuting attorney and their families had been close personal friends, that the defendant and prosecuting attorney had had business and political relations in the past, and that it would be difficult for the prosecuting attorney to conduct a trial was a sufficient showing to warrant appointment of a special

prosecuting attorney.

In *People v Doyle*, 159 Mich. App. 632, 636, 638, 641-44, 646, 406 N.W.2d 893, 895-99 (1987), the court said:

> The basis of defendants Doyle's, Kardos' and Reynolds' motion for disqualification of the prosecutor for conflict of interest is the personal relationship between Doyle and Dennis Lazar, Chief Assistant Genesee County Prosecutor. Doyle and Lazar are brothers-in-law; their wives are sisters. The Flushing drug investigation, supervised by the prosecutor's office, began in August, 1984, and implicated Doyle in September, 1984. Doyle married Lazar's sister-in-law around Christmas, 1984.
>
> . . . .
>
> The basis for defendants Walter Johnson's, Scott Johnson's and Timothy Donaldson's claim for disqualification is that the complaining witness and victim, Danny Lazar, is the brother of Dennis Lazar, Chief Assistant Prosecutor.
>
> . . . .
>
> The instant cases fall into the second category, which includes situations where the prosecuting attorney has a personal interest (financial or emotional) in the litigation, or has some personal relationship (kinship, friendship or animosity) with the accused. In Michigan, the recusal of a prosecuting attorney who has a personal interest in the case is required by the Code of Professional Responsibility. Canon 9 provides that "a lawyer should avoid even the appearance of professional impropriety." DR 5-101 is arguably applicable:
>
> "DR 5-101. Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.
>
> "(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."
>
> . . . .
>
> Courts around the country recognize two policy

considerations underlying the disqualification of prosecuting attorneys for a conflict of interest. The first policy served by the rule is fairness to the accused. It is universally recognized that a prosecutor's duty is to obtain justice, not merely to convict. . . .

The second policy served by disqualification of a prosecuting attorney for conflict of interest is the preservation of public confidence in the impartiality and integrity of the criminal justice system. *Greer, supra,* p. 268 [19 Cal. 3d 255, 561 P.2d 1164, 137 Cal. Rptr. 476 (1977)]; *Conner, supra,* p. 146 [34 Cal. 3d 441, 666 P.2d 5, 193 Cal. Rptr. 148 (1983)]; 31 ALR3d 953. American courts have consistently held that the appearance of impropriety is sufficient to justify disqualification of a prosecuting attorney. . . .

. . . .

. . . The fact that Lazar is the Chief Assistant Prosecutor and Doyle's brother-in-law creates for Lazar a conflict of interest. There is an appearance of impropriety when Lazar acts in matters concerning Doyle. His family relationship with defendant Doyle is sufficiently incompatible with the interest of the defendant, of the state and of the administration of justice generally so as to require Lazar to withdraw from Doyle's case.

*Character References*

Roth testified that, as of the time of the referee's hearing, he and Rhodes had gotten along professionally for approximately 1 year. Roth described Rhodes as being courteous and professional and said that Rhodes' bad conduct was out of character.

Howard Spencer, Gary Washburn, and Steven Stumpff, all practicing attorneys in Broken Bow, testified they were of the opinion that Rhodes was truthful and honest. None of these witnesses had experienced an instance where Rhodes filed criminal charges which were not based on the facts or the law. Rhodes was described as a good criminal lawyer who was well prepared and showed a good grasp of the issues.

Ronald Ruff, an attorney from North Platte whose firm

contracts to do public defender work in Custer County, testified that he became acquainted with Rhodes in late 1988. Ruff was of the opinion that Rhodes was well prepared and had a good grasp of the law. Ruff noted that Rhodes was extremely courteous and that he had not noticed any charges filed by Rhodes that were not based on the facts or the law.

Attorneys Carlos Schaper, William Steffens, and Ted Huston also testified that they were of the opinion that Rhodes was truthful, honest, courteous, professional, and competent.

The record also contains letters of endorsement from the following people: Robert Scott, Custer County supervisor; Herbert Buntemeyer, Custer County supervisor; Robert L. Leatherly, Custer County supervisor; Ronald Ruff; W.G. Arnold, D.D.S.; Grayston Cool, Custer County supervisor; Roberta Snyder, teacher; Donald Ellingson, register of deeds; Lea Dell Jones, Custer County treasurer; Eugene Schiltz, Custer County surveyor; Robert Jacobsen, mayor of Broken Bow; Edwin Scott, Custer County supervisor; L.O. Muhlbach, chief of police; Larry Hickenbottom, Custer County supervisor; Bryan Clark, pastor of Berean Fundamental Church; John Finney, former associate county judge and clerk magistrate; Marian Woodward, Custer County clerk; Leroy Schaad, Custer County assessor; Harry Duryea, Custer County highway superintendent; Max Bristol, Custer County weed control authority superintendent; and Joseph Divis, Blaine County Attorney.

## DISCIPLINE TO BE IMPOSED

We find that the respondent violated the provisions of DR 1-102, DR 2-110, DR 5-101, and DR 7-102.

In *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987), we said that the conduct of a government attorney is required to be more circumspect than that of a private lawyer because improper conduct on the part of such an attorney reflects upon the entire system of justice in terms of public trust.

The evidence is unrefuted that during late 1985 and early 1986, the respondent actively cultivated a friendship with Daniel Speer.

During the time respondent was fostering the relationship with Speer, he was also engaged in prosecuting him. During the various trips they took together, respondent discussed with Speer cases involving sexual matters not only involving Speer, but involving other individuals who were sexually involved with girls in Broken Bow who were under the age of consent. The relationship between Speer and the respondent was not the type of relationship that is proper between the prosecutor and the defendant in a criminal case.

The record shows by clear and convincing evidence that the respondent violated DR 5-101(A) by prosecuting Speer at a time when his professional judgment might reasonably have been affected by respondent's own personal interests and that respondent violated DR 2-110 by failing to withdraw from prosecuting Speer in the criminal mischief case. Respondent also engaged in investigating sexual assault allegations against Speer during the time he and Speer were engaged in a close personal friendship and filed burglary charges against Speer after discovering that Speer was an alleged "child molester."

The respondent's conduct toward Roth and his behavior during the Speer deposition were erratic, extraordinary, and defy propriety. The record sustains this finding, regardless of the motivation for respondent's behavior. The record shows by clear and convincing evidence that respondent violated DR 1-102 by engaging in conduct that was prejudicial to the administration of justice and adversely reflected on his fitness to practice law.

In *State ex rel. NSBA v. Rasmussen*, 232 Neb. 53, 55, 439 N.W.2d 481, 483 (1989), we said:

> The nature and extent of discipline to be imposed is determined by a consideration of the nature of the offense, the need for deterring others, the maintenance of the reputation of the bar as a whole, the protection of the public, the attitude of the offender generally, and his or her present or future fitness to continue in the practice of law.

The purpose of a disciplinary proceeding is not so much to punish an attorney as it is to determine, in the public interest, whether the attorney should be permitted to continue to

practice law. *State ex rel. NSBA v. Douglas, supra.*

It is significant that several of the respondent's peers testified that he is an able and capable attorney and has discharged his duties as county attorney well in most cases. Also significant is that respondent provided many favorable references from county officials and citizens. These references constitute a mitigating factor but do not exonerate the respondent from his misconduct.

Taking into consideration the attitude of the respondent, in light of the evidence presented and the fact that this matter involves both the respondent's ability to practice law and his ability to discharge the office of county attorney, and based upon the seriousness of the matter, we conclude that the appropriate discipline to be imposed in this case is suspension from the practice of law for a period of 3 years.

JUDGMENT OF SUSPENSION.

WHITE, J., not participating.